FOURTH DIVISION

No. 1-06-3222

| | | |
|---|---|---|
| RHODORIS JOHNSON, Individually and as | ) | Appeal from the Circuit Court of |
| Special Administrator of the Estate of Jesse | ) | Cook County, Illinois |
| M. Johnson, Deceased, | ) | |
| | ) | No. 02 L 4486 |
| Plaintiff-Appellant, | ) | |
| | ) | Honorable Deborah Mary Dooling, |
| v. | ) | Judge Presiding |
| | ) | |
| LOYOLA UNIVERSITY MEDICAL CENTER, | ) | |
| RICHARD M. CARROLL, and DIANE WALLIS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

MODIFIED OPINION ON DENIAL OF PETITION FOR REHEARING

JUSTICE MURPHY delivered the opinion of the court:

Plaintiff, Rhodoris Johnson, individually and as special administrator of the estate of

Jesse M. Johnson, filed an action for survival and wrongful death based on medical malpractice

against defendants, Loyola University Medical Center, Richard M. Carroll, M.D., and Diane

Wallis, M.D. On May 30, 2006, the jury returned a verdict in favor of plaintiff against Carroll

and vicariously against Loyola in the amount of $1,412,000. The jury found in favor of Wallis.

The trial court entered judgment notwithstanding the verdict (judgment *n.o.v.*) in Carroll's and

Loyola's (hereinafter, collectively defendants) favor on the basis that plaintiff failed to prove

proximate cause because her expert, a pulmonologist and critical-care specialist, was not

qualified to testify as to whether a cardiac catheterization and bypass surgery would have

prolonged or saved the decedent's life. On appeal, plaintiff contends that the trial court erred by

(1) barring her expert witness from testifying about the need and timing for cardiac catheterization and (2) granting judgment *n.o.v.*.

## I. BACKGROUND

### A. Treatment at Loyola

On June 1, 1995, Jesse Johnson suffered a cardiopulmonary arrest at his home and was transported by ambulance to Loyola University Medical Center. He was admitted to the cardiac care unit under the primary care of Dr. Wallis, a board-certified cardiologist and critical-care specialist. Wallis testified that tests revealed evidence of renal compromise, but Johnson had not suffered a recent myocardial infarction.

Johnson was removed from the ventilator on June 2, 1995. That same day, Dr. Wallis scheduled a cardiac catheterization for Monday, June 5. Wallis testified that her practice was to explain to the patient the risks of an angiogram, including renal failure, which would require dialysis. Medical records showed that Johnson said he would rather die than be on dialysis. In addition, Wallis testified that an angiogram was not done before he was transferred to the medical floor on June 4 because they wanted to let him stabilize and to look into the kidney situation.

On June 4, 1995, Wallis ordered Johnson's admission to a general medical floor, without continuous telemetry or oxygen monitoring. Dr. Carroll, a board-certified cardiologist, became his attending physician. Wallis testified that she decided that Johnson could be transferred to a medical floor because he had been monitored for four days and did not have any heart arrhythmias. Furthermore, his oxygen saturation had been monitored and did not waver. Her

plan at the time of the transfer was to have a renal consultant talk to him to reassure him that the fear behind his failure to give consent was exaggerated.

Dr. Carroll saw Johnson on the morning of June 5, 1995. He ordered a dobutamine stress test to evaluate Johnson's cardiac status. The stress test would allow doctors to determine whether an angiogram was necessary.

That night, Johnson suffered another cardiopulmonary arrest. Conflicting evidence was presented as to what occurred just before the arrest. Reports by two staff physicians stated that Johnson was found unresponsive in his chair, with a heart rate of less than 30 beats per minute. However, Sandra Walshon, Johnson's nurse for the night, testified based on his medical records that at 9 p.m., Johnson called her into his room and complained of shortness of breath. As she was applying oxygen, Johnson became diaphoretic. A code team arrived, and Walshon testified based on the records that she was present when Johnson went into cardiopulmonary arrest. Johnson was resuscitated, but he did not regain consciousness.

After Johnson was stabilized, Dr. Lewis performed an emergent catheterization and angiogram after consent forms were signed by his wife and daughter. However, a neurology assessment showed that Johnson suffered from prolonged oxygen deprivation resulting in irreversible brain damage. He never regained consciousness and was dependent on a ventilator until his death several months later.

### B. Plaintiff's Expert Witness

Dr. Newmark, plaintiff's expert witness, is board certified in internal and pulmonary medicine and critical care. He is the chief of critical care medicine and director of the intensive care unit at North Shore University Hospital in Plainview, New York. Newmark has been practicing critical-care medicine for more than 20 years.

Newmark testified that he has seen many patients with similar problems to Johnson on a regular basis in his intensive care unit, as critical-care medicine involves a range of specialties, including cardiology, pulmonary medicine, and renal diseases. In his practice, he has had to assess and treat people with acute cardiac problems, heart attacks, arrhythmias, and angina and determine whether they need to have further testing done. He routinely sent patients for stress tests and, based on these results, he would contact a cardiologist and advise him or her of the need for cardiac catheterization. However, the cardiologist would have to make the final determination. He worked closely with cardiologists and was familiar with their practices, procedures, and policies in making a diagnosis for the need for a cardiac catheterization and determining the timing and urgency of a cardiac catheterization. He testified that 30% of the board-certification exam for critical-care medicine involves cardiology but admitted that he was not familiar with American College of Cardiology guidelines for urgent cardiac catheterizations. He also had experience with ordering dobutamine stress echo tests and renal consults.

After hearing Newmark's trial testimony and *voir dire*, the trial court found that the doctor was qualified to give his opinion as to whether Johnson should have been monitored or placed in a telemetry unit. However, the trial court ruled that plaintiff had not met the

foundational requirement for the doctor to testify as to the need for and timing of cardiac catheterization or bypass surgery.

Newmark testified that it was a deviation to transfer Johnson from a monitored bed to an unmonitored bed. If he had been adequately monitored, the staff would have seen signs of his deterioration much earlier and been able to treat him earlier and prevent the cardiac arrest. There would have been earlier treatment and, therefore, there would not have been brain damage from the cardiac arrest, which was due to the delay in recognizing that he was going into cardiac arrest.

Newmark further opined that if Johnson had had an angiogram two or three days earlier, the results would have revealed severe three- or four-vessel disease and a necessity for him to remain in the cardiac care unit (CCU) with close monitoring in preparation for bypass surgery. If that diagnosis had been made before the cardiac arrest, Johnson would have gone on to have bypass surgery and had a dramatically decreased chance of having another cardiac arrest. His life expectancy would have been tremendously improved. However, once a patient suffers irreversible brain damage, he is no longer a candidate for bypass surgery.

Newmark testified that when a patient has irreversible brain damage, his chance of surviving long term is dramatically reduced, as he is more likely to die of multiple causes. In addition, Johnson was deprived of the chance to have bypass surgery, which would have significantly improved his heart status, because doctors were not going to perform bypass surgery once Johnson had irreversible brain death.

## C. Defendants' Witnesses

Wallis, Carroll, and defendants' expert cardiologist, Dr. Morton Arnsdorf, testified that even if bypass surgery had been performed, it would not have prevented the second arrest. Wallis testified that emergency bypass surgery is only indicated when a patient has left main coronary heart disease, which Johnson did not have, according to the angiogram performed after the second arrest. In addition, a bypass would not repair the blockages in Johnson's arteries that were due to dead heart tissue.

Defendant Carroll testified that an emergency angiogram would not have prevented the second cardiac arrest because, based on the results of the stress test and the angiogram, he did not believe that his heart caused either arrest. Based on the results of the stress test and Johnson's shortness or breath, Carroll concluded that the second arrest was the result of a pulmonary event.

Similarly, Arnsdorf testified that even if the arrest had not occurred on June 5 and the angiogram results had been available before that, Johnson would not have been a candidate for emergency bypass surgery. He did not believe that the arrest on June 5 was a primary cardiac event because Johnson was not in the kind of rhythm that required defibrillation, and his blood pressure came back after ventilation. Furthermore, Johnson was at an increased risk for bypass surgery because of his diabetes and the condition of his kidneys.

Arnsdorf further testified that Johnson did not require monitoring after he was stabilized. Johnson became acutely short of breath and then crashed in the presence of a nurse; therefore, this was a witnessed event and there was no warning until he called her. He did not believe that there would have been warning signs before his complaints of shortness of breath if he had been

monitored in the CCU.

Dr. Lewis testified that he did the emergency angiogram after Johnson's second arrest. Lewis opined that even if the angiogram had been done before the arrest in the hospital, Johnson was not a candidate for emergency bypass surgery because of his multiple medical problems, including his renal insufficiency. In addition, the cardiac arrest was not caused by coronary artery disease, but by hypertension.

### D. Verdict and Posttrial Motions

The only issue presented to the jury was whether defendants were negligent when they "failed to maintain Jesse Johnson in a Cardiac Care Unit or telemetry unit with continuous EKG and O2 Sat. monitoring." On May 30, 2006, the jury returned a verdict in favor of plaintiff against Carroll and vicariously against Loyola in the amount of $1,412,000. The jury found in favor of Wallis, the other cardiologist.

The trial court entered judgment *n.o.v.* in defendants' favor on the basis that plaintiff failed to prove proximate cause. The trial court cited the rule that proximate cause in a medical-malpractice case must be established through expert testimony. Although the trial court had determined during the trial that Newmark could not present his opinion about the need for and timing of cardiac catheterization or bypass surgery, he was permitted to do so, over defendants' objection. The trial court noted:

"The plaintiff's retained expert, Ian Newmark, M.D., testified before the jury that plaintiff's decedent should have had continuous oxygen and EKG monitoring, and if the decedent had been properly monitored then there would

have been advanced notice that a second heart attack was going to happen, and then the cardiologist could have done a cardiac catheterization (angiogram) which would have indicated the decedent's heart condition and the need for coronary bypass surgery which would have prevented the second cardiac arrest and prolonged the decedent's life."

The trial court ruled that because Newmark, a pulmonologist and critical-care specialist, was not qualified to testify as to the appropriateness of cardiac catheterization and bypass surgery, his opinion that intervention through catheterization and surgery would have prolonged the decedent's life was merely speculation. Therefore, according to the trial court, there was an absence of expert testimony connecting defendants' alleged deviation from the standard of care with the decedent's second cardiac arrest. The trial court concluded that the evidence of proximate cause was insufficient to sustain the jury verdict in favor of plaintiff and against defendant Carroll.

The trial court also denied plaintiff's conditional post-trial motion. This appeal followed.

## II. ANALYSIS

Plaintiff argues that the trial court improperly granted judgment *n.o.v.* on the issue of proximate cause. Judgment *n.o.v.* should be entered only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Wodziak v. Kash*, 278 Ill. App. 3d 901, 910-11 (1996). " 'This is clearly a very difficult standard to meet, limiting the power of the circuit court to reverse a jury verdict to extreme situations only.' " *Jones v.*

1-06-3222

*Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000), quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994). An appellate court reviews *de novo* a trial court's decision to grant or deny a motion for judgment *n.o.v.* *Jones*, 316 Ill. App. 3d at 1125.

"[I]n a medical malpractice action, it is the plaintiff's duty to establish the proper standard of care to be applied to a defendant-doctor's conduct, a breach of that standard, and a resulting injury proximately caused by the breach of care." *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d 390, 406 (1991). A plaintiff must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006). Proximate cause is generally a question for the jury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997).

On appeal, defendants contend that the trial court properly granted judgment *n.o.v.* because plaintiff failed to present any competent expert testimony that Carroll's failure to monitor Johnson caused his injuries. According to defendants, Newmark's testimony that a second arrest would have been avoided if an angiogram and bypass surgery had been performed were speculative because he was not qualified to offer such opinions.

We disagree. The only issue of negligence that was presented to the jury was whether defendants were negligent when they "failed to maintain Jesse Johnson in a Cardiac Care Unit or

telemetry unit with continuous EKG and O2 Sat. monitoring." Through Dr. Newmark, plaintiff provided evidence that the failure to monitor Johnson was the proximate cause of his injuries. Specifically, Newmark testified that with adequate monitoring, changes in Johnson's heart rate, cardiac status, or oxygen level would have caused earlier intervention, "and I think that he would have been treated for his impending cardiac arrest in a much quicker time and, therefore, wouldn't have had the brain damage from the cardiac arrest he had." However, by the time staff had intervened, "at that point it took so long to get the circulation back up that he had a lack of oxygen to the brain and had severe irreversible brain damage which ultimately led to his death after that." While defendant's expert, Dr. Arnsdorf, opined that monitoring would not have made a difference because the second arrest occurred in the presence of Nurse Walshon, this issue was in controversy, as two physicians' reports indicated that Johnson was found "unresponsive in chair." In the face of this conflicting evidence, the jury was entitled to reject Arnsdorf's conclusion and the evidence upon which it was based.

In granting the judgment *n.o.v.*, the trial court relied on *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997). In *Aguilera*, the decedent went to the emergency room complaining of weakness to the left side of his body. After he began suffering seizures, he was given a CT scan, which revealed a massive intracerebral hemorrhage. The plaintiff's experts testified that the failure of the emergency room physician to order an earlier CT scan while the decedent was undergoing treatment and observation was a deviation from the standard of care. One of the experts testified that assuming a prompt CT scan, he would have deferred to a neurosurgeon to decide whether surgical intervention was appropriate. The other testified that he

would seriously consider, if not defer to, the neurosurgeon's opinion. However, the only two neurosurgeons to testify agreed with the treating neurologist that surgery would not have been appropriate, even with an earlier CT scan.

This court upheld the entry of a judgment *n.o.v.* on the basis that the experts' opinions failed to establish proximate cause. "Without supporting testimony from a neurosurgeon, plaintiff's experts' testimony was insufficient to show that neurosurgery, much less effective neurosurgery, should have occurred absent defendants' negligence." *Aguilera*, 293 Ill. App. 3d at 975. "The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case." *Aguilera*, 293 Ill. App. 3d at 975.

The trial court also found *Krivanec v. Abramowitz*, 366 Ill. App. 3d 350 (2006), to be analogous. In *Krivanec*, the defendant doctor failed to perform a stress test and failed to tell the decedent that he needed an angiogram within the week. Two months later, the decedent saw his cardiologist, who changed his medication but failed to perform an angiogram. The decedent's estate argued that the defendant's negligence denied his treating cardiologist of an opportunity to properly diagnose and treat his condition, which would have prevented his fatal heart attack. The plaintiff's expert testified that if the decedent had had an angiogram within a week of his hospitalization, it would have shown the need for a bypass, and a bypass most likely would have prevented the heart attack.

On appeal, this court held that the plaintiff failed to establish proximate cause; the

defendant's negligence was predicated on his failure to provide information to the patient, not to the treating cardiologist, and there was no evidence that the treating cardiologist lacked the necessary information to make an informed diagnosis and treat the patient accordingly. *Krivanec*, 366 Ill. App. 3d at 359. "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible." *Krivanec*, 366 Ill. App. 3d at 359. "Given the complete absence of expert testimony connecting defendant's deviation from the standard of care with Krivanec's fatal injury, the evidence of proximate cause was insufficient to submit to a jury." *Krivanec*, 366 Ill. App. 3d at 360. Accordingly, the trial court erred in denying the defendant's motion for directed verdict. *Krivanec*, 366 Ill. App. 3d at 360.

The trial court, relying on *Aguilera* and *Krivanec*, assumed that plaintiff's theory was that adequate monitoring would have allowed doctors to perform an angiogram and bypass surgery, which would have saved Johnson's life. According to the trial court, because Newmark was found unqualified to testify about the angiogram and bypass surgery, there was no testimony establishing proximate cause. However, the only question presented to the jury was whether defendants were negligent when they failed to adequately monitor Johnson. The trial court specifically found Newmark to be qualified to testify regarding the inadequate monitoring; he testified that if Johnson had been adequately monitored, the staff could have intervened earlier and Johnson would not have suffered oxygen deprivation and brain death. Therefore, unlike *Aguilera* and *Krivanec*, here, there was not a "complete absence of expert testimony connecting" (*Krivanec*, 366 Ill. App. 3d at 360) defendants' deviation from the standard of care with

Johnson's injuries. Because Newmark was qualified to testify regarding the issue presented to the jury, *Aguilera* and *Krivanec* are distinguishable.

We agree with plaintiff that similar testimony was held sufficient in *Holton*. In *Holton*, the plaintiff became paralyzed as a result of the defendants' failure to timely diagnose and treat pressure on her spinal cord caused by fractured vertebra. The jury returned a verdict in favor of the plaintiff, and in a posttrial motion, one of the defendants argued that it was entitled to a judgment *n.o.v.* because the plaintiff failed to present expert testimony that an earlier call to her physicians about her progressive weakness would have prevented her paralysis. Rejecting the defendant's argument, the court held that the plaintiff was not required to prove that an earlier call to her doctors would have resulted in a more favorable outcome. *Holton*, 176 Ill. 2d at 107-08. Moreover, she contended that the failure of the defendant's nursing staff to accurately report the progression of her decline was a proximate cause of her paralysis. *Holton*, 176 Ill. 2d at 108. "Had the doctors been given the opportunity to properly diagnose Mrs. Holton's condition based on accurate and complete information, they would have had the opportunity to treat her condition by ordering the appropriate treatment." *Holton*, 176 Ill. 2d at 108. Because of the hospital's negligent failure to accurately and timely report the plaintiff's symptomotology, the appropriate treatment was not even considered. *Holton*, 176 Ill. 2d at 108. Therefore, the defendants failed to establish that they were entitled to judgment *n.o.v. Holton*, 176 Ill. 2d at 108.

Similarly, in *Wodziak v. Kash*, 278 Ill. App. 3d 901 (1996), the jury returned a verdict in favor of the plaintiff for the delayed treatment of the decedent's stenosis. The defendant argued in a posttrial motion that he was entitled to judgment *n.o.v.* because the plaintiff's expert

testimony was insufficient to establish that the defendant's failure to diagnose the decedent proximately caused an injury to the plaintiff. According to the defendant, the expert spoke only in generalities about the effects of the delay in treatment without addressing the effect on the decedent himself. This court found that "to establish proximate cause, plaintiff's evidence must show to a reasonable degree of medical certainty that the negligent delay in diagnosis lessened the effectiveness of treatment." *Wodziak*, 278 Ill. App. 3d at 912. The court cited testimony that instead of speaking in generalities, the expert was referring specifically to the decedent. *Wodziak*, 278 Ill. App. 3d at 912. Accordingly, the testimony was sufficient to establish that the delay in diagnosis lessened the effectiveness of the treatment of the decedent's stenosis. *Wodziak*, 278 Ill. App. 3d at 913. In addition, even assuming the defendant's characterization of the expert's testimony that his negligence delayed treatment and the delayed treatment is much less effective, such testimony logically requires the conclusion that the decedent's treatment was much less effective because of the delay. *Wodziak*, 278 Ill. App. 3d at 913.

We conclude that defendants were not entitled to judgment *n.o.v.* where the only question presented to the jury was whether defendants were negligent when they failed to adequately monitor Johnson and where plaintiff's expert testified that such a failure was the proximate cause of Johnson's injuries.

Finally, defendants contend that we should address their arguments in support of a new trial or remand the case for a ruling on their motion for new trial. We find, however, that defendants waived these arguments when they failed to secure a conditional ruling on their alternative motion for new trial, as required by section 2-1202(f) of the Code of Civil Procedure

1-06-3222

(735 ILCS 5/2-1202(f) (West 2004)).  See *Cohan v. Garretson*, 282 Ill. App. 3d 248, 259 (1996);

*Varady v. Guardian Co.*, 153 Ill. App. 3d 1062, 1068 (1987).

### III.  CONCLUSION

For the foregoing reasons, the trial court's grant of judgment *n.o.v.* is reversed and the

original judgment stands.

Reversed.

CAMPBELL and O'BRIEN, JJ., concur.

1-06-3222

| | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT |
|---|---|
| Please Use Following Form: | (Front Sheet to be Attached to Each Case) |

**Complete TITLE of Case**

RHODORIS JOHNSON, individually and as special administrator of the Estate of Jesse M. Johnson, deceased,

Plaintiff-Appellant,

v.

LOYOLA UNIVERSITY MEDICAL CENTER, RICHARD M. CARROLL, M.D., and DIANE WALLIS, M.D.,

Defendants-Appellees.

**Docket No.**

**COURT MODIFIED Opinion Filed**

No. 1-06-3222
Appellate Court of Illinois
First District, FOURTH Division

June 26, 2008
(Give month, day and year)

**JUSTICES**

JUSTICE MICHAEL J. MURPHY delivered the opinion of the court:

Campbell, and O'Brien, JJ., concur.

dissents.

**APPEAL from the Circuit Court of Cook County, Illinois.**

Lower Court and Trial Judge(s) in form indicated in the margin:

Honorable Deborah Mary Dooling, Judge Presiding

For APPELLANTS, John Doe, of Chicago.

For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)

Also add attorneys for third-party appellants or appellees.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.

FOR APPELLANT:
Paul R. O'Malley, Ltd., 77 W. Washington Street, Suite 605, Chicago, IL 60602
Phone: 312-263-3212
Of counsel: Paul R. O'Malley

FOR APPELLEES:
Donohue Brown Mathewson & Smyth LLC, 140 S. Dearborn Street, Suite 800, Chicago, IL 60603
Phone: 312-422-0900
Of counsel: Sherri M. Arrigo, Karen Kies DeGrand, Todd J. Stalmack

-16-

1-06-3222

(USE REVERSE SIDE IF NEEDED)

(USE REVERSE SIDE IF NEEDED)