# Illinois Official Reports

## Appellate Court

---

### *Guerra v. Advanced Pain Centers S.C.*, 2018 IL App (1st) 171857

---

| | |
|---|---|
| Appellate Court Caption | JOHN GUERRA, as Special Administrator of the Estate of Jill Guerra, Deceased, Plaintiff-Appellant, v. ADVANCED PAIN CENTERS S.C. and EUGENE G. LIPOV, M.D., Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-17-1857 |
| Filed | November 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-8268; the Hon. Elizabeth M. Budzinski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David R. Nordwall, of Law Office of David Nordwall, LLC, and Peter Tarpey and Eric Jones, of Tarpey, Jones & Schroeder, LLC, both of Chicago, for appellant.<br><br>Julie A. Teuscher and Brian J. Hickey, of Cassiday Schade, LLP, of Chicago, for appellees. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Walker concurred in the judgment and opinion.<br>Justice Pucinski dissented, with opinion. |

**OPINION**

¶ 1    After Jill Guerra died from an acetaminophen overdose, her husband, John Guerra, as the executor of her estate, brought an action for medical malpractice against Advanced Pain Centers S.C. and its medical director and Jill's pain management doctor, Dr. Eugene G. Lipov. John claims that his wife became addicted to opioids during the 10 months Lipov treated her, and Lipov's negligent failure to manage her pain medication proximately caused her death.

¶ 2    After trial, a jury returned a general verdict in John's favor attributing 50% of the fault to Jill and awarding no damages. In response to a special interrogatory, the jury returned a special verdict finding that someone other than Dr. Lipov to be the sole proximate cause of Jill's death.

¶ 3    John's first posttrial motion resulted in the trial court setting aside the special verdict on the basis of error in giving the special interrogatory. According to the trial court, the instruction and interrogatory improperly implicated John as the sole proximate cause of Jill's death. Lipov then moved for judgment notwithstanding the verdict (JNOV), arguing that John's expert witness, Dr. Steven Richeimer, failed to establish proximate cause. While not an addiction specialist, Richeimer opined that Lipov should have sent Jill to see one. The trial court granted the motion stating, "plaintiff is missing the necessary expert testimony to establish proximate causation to link the alleged deviations from the standard of care to Jill's death." After the court granted Lipov's JNOV, John filed a second posttrial motion challenging the court's ruling on proximate cause and again asking for a new trial. This motion, too, was denied.

¶ 4    John requests a new trial arguing (i) the trial court committed prejudicial errors and (ii) there were irreconcilable verdicts. He also argues the trial court erred in granting Lipov's JNOV and claims his expert witness established proximate cause. We affirm the JNOV because John failed to establish proximate cause. Thus, we do not need to address John's other contentions.

¶ 5                                    BACKGROUND
¶ 6                                Jill's Medical History
¶ 7    Jill Guerra was in a car accident in 1982. In 2005, she began feeling pain related to a neck injury caused by the accident. Jill underwent neck surgery in 2007, and later that year was prescribed opioids by a pain management doctor. She had a second surgery in 2008 and in 2009 started seeing a new pain management doctor. Later that year, Jill underwent a third surgery. A month after the surgery, Jill spent a few days in a psychiatric hospital. There, doctors diagnosed Jill with major depressive disorder and anxiety disorder. Jill began seeing a different pain management doctor in October 2009. As requested by her new doctor, Jill underwent a psychological evaluation to assess her risk for addiction. The psychologist who performed the evaluation found Jill was not at risk of abusing her medication.

¶ 8    Later, Jill's pain management doctor asked her to go for another psychological evaluation. Jill refused. In July 2010, that same doctor discharged Jill from her care after discovering Jill received additional pain medication from her primary care physician. A month later, Jill's primary care physician suggested she get a psychiatric consultation, which she declined to undergo.

¶ 9    Jill found another pain management doctor who saw her for a month before referring her to Dr. Lipov in September 2010. By the time Jill came under Lipov's care, she had seen four pain

management doctors, underwent three surgeries, and received four referrals to a mental health professional (although she availed herself to a mental health professional only once).

¶ 10 Lipov monitored and modified her pain medication, based on her complaints of pain. During the 10 months he treated her, Lipov prescribed Norco, Dilaudid, Vicoprofin, and Opana (opioids), and Klonopin and Xanax (anti-anxiety medications). Twice, during her treatment with Lipov, Jill called and complained that the pharmacy shorted her opioid prescriptions. Both times Jill received a new prescription to make up for the lost pills. Jill also increased her medication on her own, which came to light when she called Lipov's office to refill prescriptions early.

¶ 11 Lipov also tried to treat the cause of Jill's pain by performing "facet injections" into her spine. Lipov first performed an injection on September 30, 2010, which according to Jill provided some pain relief, so he performed additional injections on October 21, 2010, and November 21, 2010, which failed to provide relief. He also twice performed radiofrequency procedures, which involves applying heat to relieve nerve pain, but these too failed to provide sufficient pain relief. Eventually, Lipov referred Jill to an orthopedic spine surgeon, who performed spine surgery on Jill in May 2011.

¶ 12 On July 14, 2011, Jill told Lipov that she spent two days in the hospital and was unsure what had happened. At that appointment she informed Lipov that she wanted to start coming off medications. Lipov decreased the strength of Jill's prescription. But, at her next appointment on July 21, he increased the strength of Jill's opioid prescription. He testified that the new heightened prescription was meant to counter an increase in Jill's pain, and that it is common for patients to experience increased pain one month after surgery.

¶ 13 Three days later, Jill suffered an acetaminophen overdose. The exact timing of that day's events is unclear. Jill's teenage daughters, Katie and Jackie, first realized Jill was unwell. Katie testified that when she came home that day, Jill was on the couch. Katie said "hi," and Jill did not respond. Katie said it wasn't unusual for Jill to be asleep on the couch. Jackie testified that Jill was often "out of it." After Katie came home, Jackie and Katie both spoke to Jill and realized she was unresponsive. At some point, Katie came downstairs and found Jill on the floor. Katie then called John at work. The medical records state Katie called at 11 a.m., but Katie testified that she did not remember when she called John and disagrees with the time listed in the medical record. Jackie also testified that she called John after seeing Jill unresponsive on the couch. In her deposition she said she called John at 2:30 p.m. but, during trial, she couldn't remember the exact time.

¶ 14 After finishing his eight-hour work shift, at about 3 or 3:30 p.m., John went home where he found Jill on the couch. (The medical records state someone had put Jill back on the couch.) John testified that when he got home he and the daughters placed Jill on the floor. The medical records state John called an ambulance at 7:58 p.m., which took Jill to the Northwest Community Hospital. She never regained consciousness and died two days later.

¶ 15 The medical examiner concluded that Jill died of an acetaminophen overdose and ruled her death a suicide. Jill's history of mental illness and the high levels of acetaminophen in her system caused the medical examiner to believe the overdose was self-inflicted. Tylenol, as well as Norco, contain acetaminophen. An open question is whether Jill had opioids in her system at the time of her death because the drug toxicology screen (which would have indicated the presence of opioids) is not included in Jill's medical records.

¶ 17    John Guerra, as the special administrator of Jill's estate, filed a wrongful death action, based on medical malpractice, against Advanced Pain Centers S.C. and Dr. Lipov. Lipov filed an affirmative defense, claiming Jill was contributorily negligent. Later, Lipov moved to add a second affirmative defense claiming John was contributorily negligent, but the trial court denied the motion.

¶ 18    Before trial, both sides filed multiple motions *in limine*. John requested that the court bar Lipov from arguing that John was contributorily negligent in light of the denial of Lipov's affirmative defense. The court denied John's motion. The case went to trial in May 2016. John relied on the testimony of a single expert witness, Dr. Steven Richeimer, who specializes in pain management. Richeimer testified that he was not offering opinions as a psychiatrist. He testified that there were numerous "red flags" that Jill was addicted to opioids including running out of medication early, reporting a high level of pain scores, requesting early medication refills, taking more medication than is prescribed, requesting specific medications, seeking medication from other doctors, requesting stronger doses of medication, claiming pharmacy errors in filling a prescription, and unexplained emergency room visits. Richeimer testified that Lipov failed to meet the standard of care for a pain management doctor by not recognizing these signs of opioid addiction, and a prudent pain management doctor would have discussed addiction with Jill and referred her to an addictionologist. "He should seek to treat the addiction," Richeimer stated. "Probably most pain doctors are not addictionologists. So he probably has to refer that patient to people who will help with that. And he should work with the patient to start getting them off their opioids," either by sending them to a detox program or weaning them off of the prescription medication.

¶ 19    On cross-examination, Richeimer agreed that some aspects of Lipov's treatment helped Jill, and that the injections, radio frequency treatments, and referral to an orthopedic surgeon were within the standard of care. He also agreed that Jill was likely addicted to opioids at least as early as 2009 and her treating physician should have weaned her off them then. He acknowledged that on at least five different occasions Lipov denied Jill's over the phone request for prescription refills and required that she come into the office or schedule a visit.

¶ 20    During the trial, the jury received Illinois Pattern Jury Instructions, Civil, No. 12.04 (2011), which states that if any party other than the defendant is the "sole proximate cause" of Jill's injuries, then the jury must find in Lipov's favor. The court also granted Lipov's request for a special interrogatory that read: "Was the sole proximate cause of Jill Guerra's death the conduct of someone other than Dr. Eugene Lipov?"

¶ 21    The jury returned a general verdict in favor of John. This general verdict found Jill to be 50% responsible for her own death and awarded no damages. The jury also answered "yes" to the special interrogatory.

¶ 22    John filed a motion to vacate the special verdict and for a new trial claiming (i) the trial court erred in allowing the sole proximate cause instruction, (ii) the trial court erred in allowing the special interrogatory, (iii) the trial court erred in allowing evidence of John and the family's contributory negligence, and (iv) the verdicts were legally inconsistent. He argued the instruction and interrogatory were improperly used to target John and the family as the sole proximate cause of Jill's death. Sole proximate cause should implicate a third party not involved in the litigation, and John noted that he and the children are parties to the litigation. John also claimed the trial court did not allow Lipov to use John's contributory negligence as

an affirmative defense, and so the court should have barred evidence and arguments on the issue. In addition, John claimed the verdicts were legally inconsistent because the general verdict was in John's favor, but the special verdict found he failed to prove proximate cause. Due to the inconsistency, John argued the special interrogatory should be set aside and a new trial ordered.

¶ 23    The trial court found it erred in allowing the special interrogatory because the sole proximate cause instruction and interrogatory were improperly used to target a party. The trial court vacated the special verdict and entered judgment in favor of John (with no damages) based on the general verdict.

¶ 24    Lipov then moved for JNOV, claiming Richeimer was not an addiction specialist. Richeimer testified that Lipov should have noticed Jill's addiction and sent her to a specialist for treatment, but John did not present an expert to testify about what treatments were feasible and how they may have helped Jill. The trial court granted JNOV in Lipov's favor.

¶ 25    John filed another motion for a new trial, arguing (i) the JNOV was improperly granted because Richeimer listed concrete actions Lipov could have taken to treat Jill's addiction and (ii) John is entitled to a new trial because (a) the trial court improperly allowed the sole proximate cause instruction, (b) the trial court improperly allowed the special interrogatory, (c) the trial court erred in allowing evidence of John and the family's contributory negligence, (d) when a special verdict is vacated the trial court must order a new trial, and (e) the jury verdicts were legally inconsistent. The trial court denied John's motion. John appeals the denial of both motions for a new trial, the order entering judgment based on the general verdict, and the order granting JNOV in favor of Lipov.

¶ 26    We affirm. John failed to prove proximate cause as Richeimer's testimony leaves an evidence gap. Richeimer is not an addiction specialist and John needed to present testimony from an addiction expert to claim Lipov's actions proximately caused Jill's death. Because we affirm the JNOV, we do not need to address John's arguments for a new trial.

¶ 27                                ANALYSIS
¶ 28                  Judgment Notwithstanding the Verdict
¶ 29    John contends the trial court erred in granting a judgment notwithstanding the verdict on the issue of proximate cause. A deviation from the standard of care and whether that deviation was a proximate cause are normally questions for the jury. *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 971 (1997). A court will only grant a judgment notwithstanding the verdict when the evidence, taken in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict can stand. *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 408 (2000). The standard for JNOV " 'is a high one.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 106 (2006)). "[J]udgment *n.o.v.* is inappropriate if 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *Id.* at 178 (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). We review a grant of JNOV *de novo*. *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 121 (2008).

¶ 30    To succeed on a medical malpractice claim, the plaintiff must prove (i) the standard of care a medical provider should have followed, (ii) the defendant failed to meet the standard of care,

and (iii) the plaintiff's injuries were proximately caused by the defendant's failure to meet the standard of care. *Id.* (citing *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d 390, 406 (1991)). To prove proximate cause in a medical malpractice case, the plaintiff must show that it is "more probably true than not true" that the doctor's failure to adhere to the standard of care proximately caused injury. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006); see also *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 846 (2010) ("The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation."). A plaintiff is not obligated to prove he or she would have gotten a "better result" if the doctor followed the proper standard of care. Instead the plaintiff must prove that the breach of the standard of care more likely than not caused the injury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 106-07 (1997).

¶ 31     The trial court found that a JNOV was warranted because John failed to offer expert testimony to establish proximate causation to link the alleged deviations from the standard of care to Jill's death, which resulted from suicide by Tylenol overdose. For support, the trial court relied on *Aguilera*, 293 Ill. App. 3d 967. In *Aguilera*, the decedent went to the emergency room complaining of weakness on the left side of his body. *Id.* at 968. After he began suffering seizures, he was given a CT scan, which revealed a massive intracerebral hemorrhage. The plaintiff's expert testified that assuming a prompt CT scan, he would have deferred to a neurosurgeon to decide whether surgical intervention was appropriate. A second expert testified that he would seriously consider, if not defer to the neurosurgeon's opinion. But, the only two neurosurgeons to testify agreed with the treating neurologist that surgery would not have been appropriate, even with an earlier CT scan. *Id.* at 969-70.

¶ 32     The appellate court upheld the trial's court's JNOV, finding that the experts' opinions failed to establish proximate cause. *Id.* at 975. "Without supporting testimony from a neurosurgeon, plaintiff's experts' testimony was insufficient to show that neurosurgery, much less effective neurosurgery, should have occurred absent defendants' negligence." *Id.* "The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to a surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to the plaintiff's case." *Id.*

¶ 33     Similarly, in *Townsend*, 318 Ill. App. 3d at 409-10, the plaintiff's expert witnesses claimed the hospital negligently failed to seek an imaging study for the decedent. The hospital admitted the decedent and improperly treated her for a kidney infection. *Id.* at 408. The decedent died from septic shock caused by an undiagnosed kidney stone, which the medical staff would have found had they followed the standard of care and done an imaging study. *Id.* at 408, 410. Had they ordered the imaging study and found the kidney stone, a radiologist or a urologist would have decided the course of treatment. *Id.* at 411. The plaintiff failed to present testimony from either a radiologist or urologist. The court stated,

> "there is no evidence of what a urologist or interventional radiologist would have done to relieve the obstruction. No one said what the treatment would have been. No one said whether the right treatment was available or whether [decedent] was a candidate for it ***.

We conclude the jury in this case was left to speculate about proximate cause." *Id.* at 414.

¶ 34 The trial court found that as in *Aguilera*, John did not provide testimony of an addictionologist or provide "any evidence that [Jill] would have gone to an addictionologist, what the addictionologist would have done following a referral, what the diagnosis of a addictionologist would have been, what medications he could have weaned her from, and how an addictionologist's intervention would have prevented Jill Guerra's suicide by a Tylenol overdose." The trial court thus found that that John is missing the necessary expert testimony to establish proximate causation to link the alleged deviations from the standard of care to Jill's death.

¶ 35 John claims, however, that Richeimer's testimony provided the jury with sufficient evidence to find proximate cause. According to John, Richeimer gave specific, concrete steps Lipov should have taken to combat Jill's addiction. John contends Richeimer testified that Lipov should have sent Jill to a detox program or weaned her off of her pills himself and that by failing to do one of those two things, Lipov proximately caused Jill's death by overdose.

¶ 36 To support his claim John cites *Johnson*, 384 Ill. App. 3d 115. In *Johnson*, the estate of the decedent met the burden of proximate cause when an expert witness testified that the hospital's negligent failure to monitor the decedent after a heart attack proximately caused his death. The plaintiff's witness testified that, if the hospital staff had monitored the decedent after his first heart attack, they would have sooner noticed signs of his second heart attack. Earlier notice would precipitate an earlier intervention preventing oxygen deprivation and brain death (the cause of death several months after the second heart attack). *Id.* at 118. The trial court entered JNOV in defendants' favor, citing *Aguilera*. The trial court found the plaintiff's evidence lacked a witness with the requisite expertise about how the hospital would have treated the decedent if he was properly monitored. *Id.* at 123.

¶ 37 The appellate court reversed, finding the testimony adequately established that the hospital staff's negligent failure to monitor proximately caused the decedent's injury (brain death).

> "[The witness] testified that if Johnson had been adequately monitored, the staff could have intervened earlier and Johnson would not have suffered oxygen deprivation and brain death. Therefore, unlike *Aguilera* and *Krivanec*, here, there was not a 'complete absence of expert testimony connecting' [citation] defendants' deviation from the standard of care with Johnson's injuries. Because [the expert witness] was qualified to testify regarding the issue presented to the jury, *Aguilera* and *Krivanec* are distinguishable." *Id.*

¶ 38 John claims Richeimer gave similar testimony by stating that Lipov's failure to wean Jill off of her opioids or send her to a detox program was the proximate cause of her injury addiction, which eventually resulted in her death. But, John misstates Richeimer's testimony. Richeimer testified that Lipov should have treated Jill's addiction by sending her to an addictionologist *and* by weaning Jill off of her pills, either by sending her to a detox program or doing it himself. (During oral argument, John suggested that Richeimer testified Lipov should have weaned Jill off of her pills *or* referred her to an addictionologist, which is not supported by the record.) Despite John's claim to the contrary, Richeimer testified that neither weaning Jill nor sending her to a detox program sufficed. He testified that Jill should have been referred to an addictionologist to determine the course of her addiction treatment. Richeimer testified that he was not offering opinions as a psychiatrist, and he admitted he does not treat

addiction. Instead, he refers patients to addictionologists who determine the course of addiction treatment. But, no evidence was offered regarding what the diagnosis of an addictionologist would have been, what course of treatment would have been recommended, and whether that treatment could have been successful in weaning Jill from her opioid medications and how that treatment would have prevented Jill's death from a Tylenol overdose.

¶ 39    Even if we accept John's argument that Richeimer opined that Lipov should have weaned Jill off her medication *or* sent her to an addictionologist, Richeimer's testimony alone does not establish proximate cause. Richeimer only established that there was a "mere possibility" that intervention by Lipov could have halted Jill's addiction. Moreover, unlike in *Johnson*, where an expert witness testified that monitoring a patient could have led to earlier intervention and prevented his death, neither Richeimer (who, as noted, was not offering opinions in the area of psychiatry) nor any other witness testified that if she had been weaned from opioid medications, Jill, who had a history of depression, would not have committed suicide by overdosing on Tylenol, a non-opioid, over the counter medication.

¶ 40    Like *Aguilera*, there is no expert evidence connecting Lipov's failure to identify Jill's addiction to opioids and her suicide by Tylenol overdoes. No evidence indicates that Jill would have seen an addictionologist had Lipov referred her to one. No evidence indicates what, if anything, an addictionologist would have done to help Jill with her addiction. And no evidence indicates that Jill would have gone to a detox program or would have willingly reduced her pills if Lipov had intervened. Most significantly, no evidence shows that had Lipov taken the steps Richeimer recommended to treat her opioid addiction, it is more likely than not that Jill would not have died from a Tylenol overdose.

¶ 41    John having failed to prove proximate cause, we find the trial court properly granted Dr. Lipov's motion for JNOV.

¶ 42    We need not address John's contention that the trial court erred in denying his motion for a new trial. Both parties agree granting the JNOV dispenses with the need for a new trial.

¶ 43    Affirmed.


¶ 44    JUSTICE PUCINSKI, dissenting:

¶ 45    With respect, I dissent.

¶ 46    My colleagues have decided that there is an evidence gap that is fatal to the plaintiff's case. They insist that an addictionologist was a necessary expert witness to show what treatment Jill would have had or maybe could have had or maybe might have had if the defendant doctor referred her to one. I do not agree.

¶ 47    Proximate cause was, in fact, established with Dr. Lipov responsible. Despite the lackluster case presented by the plaintiff's attorneys, it was, ironically, the defense on cross examination of Dr. Richeimer who got to the heart of it: "This is a lady basically who's used to, pardon the expression, popping pain pills. And I think that's what she did here, and she got out of—out of control. She forgot what she took. She got fuzzy from all her meds. She just keeps on popping pills and gets to toxic levels."

¶ 48    There is no evidence gap. We know everything we need to know about Jill's treatment by Dr. Lipov. He blew it.

¶ 49    The defendant, Dr. Lipov, (1) failed to recognize, let alone diagnose, her addiction; (2) failed to take any steps at all to reduce her addiction, including, but not limited to, declining to further treat her after learning that she was fudging about the number of pills she had and was doctor and pharmacy shopping, reducing the strength of the opiates he was prescribing, and weaning her off of opiates altogether; (3) increased the strength of her medicines after Jill told him she wanted to cut back; and (4) failed to refer her to anyone: not a counselor, not a psychologist, not a psychiatrist, not her primary care physician, and also not an addictionologist.

¶ 50    All of those options were available to Dr. Lipov. Instead, he decided not only to continue to treat her but to increase the opiate level in the pills he was prescribing while also giving her various sedating medicines for extended time periods without supervision.

¶ 51    Dr. Lipov treated Jill with varying strengths of Dilaudid, Norco, and Vicoprofen, sometimes simultaneously and sometimes sequentially. Simply stated, Dilaudid is stronger than Norco, and Norco is stronger than Vicoprofen: that is, the amount of opioids in each is reduced as you go down the scale from Dilaudid to Vicoprofen. Dilaudid contains hydrocodone, which is five to seven times more potent than morphine. Norco contains hydrocodone and acetaminophen, commonly called Tylenol, at a ratio of 10 milligrams of hydrocodone to 325 milligrams of acetaminophen. Vicoprofen contains hydrocodone and ibuprofen, commonly known as Advil or Motrin. During the time she was taking any of these serious opiates, she was also being given prescriptions for benzodiazepines, medicines that slow the central nervous system, *i.e.*, Xanax and Klonopin, and on top of that, large doses of acetaminophen in the Norco. No one knows what over-the-counter pills she took along with her prescriptions.

¶ 52    Jill died of acetaminophen intoxication. The toxicology screen for acetaminophen after her death indicated a level of at least 10 times the normal dosage of acetaminophen. Testimony at the trial placed the level at about 25 times the therapeutic dose. There is no toxicology report for the level of opioids in Jill at the time of her death. It is unclear from the record whether that opioid screen was done and got lost or mislaid, or whether none was done.

¶ 53    This is inexcusable. Dr. Lipov was treating Jill for pain. The treatment involved prescribing opiates. Instead of carefully monitoring her opiate use, Dr. Lipov prescribed doses of opiates for weeks at a time without supervision, checkups, or pill counts. He prescribed opiates that overlapped with earlier prescriptions. He cannot be said to have been carefully monitoring her use of opiates or her likelihood of addiction. He cannot be said to have been alert to the symptoms and behaviors of opiate abuse. Either he did or did not recognize the symptoms and behaviors of opiate abuse. If he did not recognize them, he should not be prescribing opiates to patients. If he did recognize the symptoms and behaviors of opiate abuse and ignored them, he should not be prescribing opiates to patients. It is uncontradicted that the opiates made her fuzzy. She forgot what she took. She overdosed on acetaminophen. She died of acetaminophen poisoning suicide. Dr. Lipov prescribed the opiates. He is responsible for her death.

¶ 54    At the time of her death Jill had in her possession a filled prescription for 240 Norco pills, which was filled three days earlier. That means that on July 21, Jill filled a prescription for 240 10-milligram pills of hydrocodone and 240 32-milligram pills of acetaminophen. That equals 78,000 milligrams of acetaminophen in just the prescription alone, and there is no telling what over-the-counter acetaminophen she was using alongside the prescription. The normal

recommended therapeutic dose is 3000 milligram per day. See *Tylenol Dosage for Adults*, Tylenol, https://www.tylenol.com/safety-dosing/usage/dosage-for-adults (last visited Nov. 8, 2018) [https://perma.cc/GM3C-U6PM]. Jill had 26 times the normal therapeutic dose available to her starting July 21. Dr. Lipov did not require her to return in three days, or even a week to renew a smaller prescription. Instead he gave a prescription for 78,000 milligrams of acetaminophen to a woman who had all the red flags of addiction, along with 2400 milligrams of hydrocodone, which she was supposed to take without close supervision. And, see below, she had overlapping prescriptions from July 7 for 112 Norcos that were supposed to last two weeks and a July 14 prescription for 56 Vicoprofens, which were supposed to last for seven days.

¶ 55    Testimony at the trial indicated that fatal liver failure from acetaminophen overdose is about 12-24 hours after ingestion with a peak about one to three or four days after ingestion; fatal respiratory failure from opioid overdose would be less than 2 hours after ingestion.

¶ 56    We know that Jill was a pill taker and that on the day she died she had a three day old filled prescription for 240 Norcos, and that her family testified that she was often "out of it." A patient in pain and taking an opioid could easily take too many extra opioids and/or over-the-counter Tylenols. Plaintiff's expert, Dr. Richeimer's testimony on that was uncontroverted.

¶ 57    Dr. Richeimer testified that if a reasonably careful pain management doctor does timely detect the red flags of addiction, he has to sit down with the patient, talk to the patient about the fact that he believes that they have an illness, addiction, that makes them unsafe to be treated with opioids, and he should seek to treat the addiction. He continued that since most pain doctors are not addictionologists, Dr. Lipov probably should have referred that patient to people who will help with that. And, he should have worked with Jill to start getting her off opioids.

¶ 58    Dr. Richeimer further testified that he was not aware of Dr. Lipov ever making any attempt to refer Jill Guerra to either one of the two individuals in his practice that could have helped, his colleagues the psychologist and/or psychiatrist, or to anyone else in any kind of practice.

¶ 59    Dr. Richeimer also testified that in his opinion Dr. Lipov did not comply with the standard of care at all times while treating Jill from September 16, 2010, to July 21, 2011, and that Dr. Lipov's deviation from the standard of care was the failure to recognize the addiction, failure to refer the patient for treatment of addiction, and, in fact, doing the opposite, that Dr. Lipov continued to provide and continued to escalate the doses. Dr. Richeimer continued that Dr. Lipov was "sort of fueling the flames of her pain problem by escalating the doses with chronic opioids *** in addition to that, I think if—if he had referred the patient for treatment for addiction and they had gotten off these medications, then I don't think we'd be here today because I think she'd still be alive."

¶ 60    The "if" in Dr. Richeimer's testimony is no small thing. Addiction is a mental disease, which by itself cannot be seen, touched, removed, X-rayed, magnetic resonance imaged, or CT-scanned. It is not like cancer, or a kidney stone, or a broken leg, or even some cardiac problem. Identifying and treating addiction is in the best circumstance a 50-50 proposition: treatment will work or it will not, and the variables are complex and numerous. The well respected Mayo Clinic acknowledges that: "Although there's no cure for drug addiction, treatment options *** can help you overcome an addiction and stay drug-free." *Drug*

*Addiction*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/drug-addiction/diagnosis-treatment/drc-20365113 (last visited Nov. 8, 2018) [https://perma.cc/96YP-99G8].

¶ 61     The cases cited by the majority are all cases for diseases or conditions that could be identified and actually seen in some way, but were not, or were not identified on time, or for whose treatment there were different opinions and where an additional expert was necessary.

¶ 62     This case is different. Dr. Richeimer was very clear that in his opinion to a reasonable degree of medical certainty there were red flags of Jill's actual addiction to pain pills, specifically Norcos, Dilaudids, and opioids in general. And he testified that "if" Dr. Lipov "had referred [Jill] for treatment for the addiction and [if] they had gotten off these medications *** she'd still be alive." There can be no certainty that any referral to any specialist would have been successful in treating Jill's addiction. She already had a history of failing to follow up with referrals; and no addictionologist can guarantee 100% success. It cannot be compared to a urologist saying: "Sure, if I had seen that kidney stone, I would have removed it." Or a cardiac specialist saying: "Sure, if I had seen that blocked artery, I would have done something about it." This doctor did not recognize the addiction, so he did not refer her to anyone.

¶ 63     It is not recognizing the addiction that is the foundational part of his treatment of Jill that cascaded into everything else.

¶ 64     Dr. Richeimer testified that on July 14, 2011, Dr. Lipov started to taper Jill off the opioids by switching from Norco to Vicoprofen, which was a 25% reduction in opioids, and the prescription was for one week only. However, one week later, on July 21, 2011, Dr. Lipov inexplicably gave Jill her old medicine, the Norco, the stronger pill, so from 7.5 milligrams of hydrocodone, Dr. Lipov went back to 10 milligrams of hydrocodone, and continued it day-to-day but this time he gave her a month's worth, or 240 pills, in one prescription.

¶ 65     On Jill's first visit to Dr. Lipov on September 16, 2010, she reported her pain was 4 or 5 out of 10 and he prescribed Norcos, 1 or 2 pills 4 times a day, or up to 8 pills a day or 150 Norcos total (8 pills a day divided into 150 Norcos equals an 18.75 day supply) and Klonopin. Klonopin is a brand name for clonazepam, a benzodiazepine or tranquilizer. Use of Klonopin can lead to serious side effects, including drowsiness, trouble with thinking, and suicidal thoughts. Its use needs to be closely monitored by a doctor. See *Clonazepam (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/side-effects/drg-20072102 (last visited Nov. 8, 2018) [https://perma.cc/86RG-59Y3].

¶ 66     The fact that a patient with a 4 out of 10 pain level was prescribed Norco right from the start is troubling. Dr. Lipov had no history with Jill, he did not know how she would tolerate Norco and could not know if she would have had success with something less potent, for example, Vicoprophen, to start. And he had no idea how she would tolerate the Norco in combination with the Klonopin.

¶ 67     Then she saw him on September 30, 2010, 15 days later, and Dr. Lipov prescribed Dilaudid, a 4-milligram pill, 2 pills per dose, 3 times a day for 14 days or 84 Dilaudids total, while she still should have had some of the Norcos left. He did not ask her to turn over the Norcos.

¶ 68     On October 13, 2010, again two weeks later, Dr. Lipov renewed the prescription for Dilaudid for 30 days, along with more Klonopin.

¶ 69     On October 29, 2010, Jill's chart notes: "Patient increased medications, running out early," which according to Dr. Richeimer was a clear red flag.

¶ 70     In response, on November 4, 2010, less than 30 days after the October 13, 2010, prescription, Dr. Lipov refilled the prescription but increased the length of the dose of Dilaudid for the 4-milligram dose per pill, at 6 per day, but for 30 days, or 180 pills. He added MS Contin, which is a slow release form of morphine, 15 milligrams at three times a day, and he continued the Klonopin but increased the dose from two to three times a day. MS Contin is a brand name for morphine. See *Morphine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/morphine-oral-route/description/drg-20074216 (last visited Nov. 8, 2018) [https://perma.cc/KNF9-YXPY]. So, on November 4, 2010, Jill had prescriptions for 24 milligrams of hydrocodone plus 45 milligrams of morphine plus some amount of the Klonopin, a benzodiazepine, to take each day.

¶ 71     Then, on November 24, 2010, the pharmacy called with Jill's request for more Klonopin and a 15-day supply was provided in that refill, while a part of a prescription for Klonopin should still have been available to her.

¶ 72     On December 6, 2010, there is some confusion in the record about who called whom, but Jill's chart seems to indicate that by December 20, 2010, "[i]t came to light that she had increased her pain medications to address her pain issues" and someone consulted Dr. Lipov.

¶ 73     On December 20, 2010, John took Jill to the hospital for nausea, vomiting, and inability to eat, all of which were also red flags.

¶ 74     Two days later Jill followed up with an office visit on December 22, 2010, and Dr. Lipov prescribed more medications: Norco, 2 pills at 4 times a day with a 14-day prescription or 112 pills, and he added Xanax, 1 pill at 3 times a day for 14 days, or 42 pills. Xanax is the brand name for alprazolam, which is a benzodiazepine. It is stronger than Klonopin. Its use can lead to depression, hallucinations, suicidal thoughts, and confusion. See *Alprazolam (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/alprazolam-oral-route/side-effects/drg-20061040 (last visited Nov. 8, 2018) [https://perma.cc/SM5L-GQRK]. That equals 80 milligrams of hydrocodone and 3 Xanax every day.

¶ 75     On January 11, 2011, Jill called complaining about post surgery stiffness in her jaw and tongue. Dr Lipov's office said she had to come in to get any more medication.

¶ 76     On January 17, 2011, Dr. Lipov prescribed Opana, which is another opioid, roughly 3 times the strength of morphine. Opana is the brand name for oxymorphone. See *Oxymorphone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/oxymorphone-oral-route/description/drg-20071555 (last visited Nov. 8, 2018) [https://perma.cc/CM86-DFCB].

¶ 77     On January 18, 2011, Jill called again. She was having muscle spasms in her neck and jaw and wanted Flexeril. Dr. Lipov approved a prescription for Flexeril for 30 days. Flexeril is a brand name for cyclobenzaprine, a muscle relaxant, and its side effects may include confusion or depression. See *Cyclobenzaprine (Oral Route)*, Mayo Clinic, https://mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Nov. 8, 2018) [https://perma.cc/XW9Z-7LLX].

¶ 78     Jill called again 8 days later (roughly January 24) and said she was on Opana. She said it was too strong for her, she talked to Dr. Lipov and was given Norco again, 2 tablets 4 times a day for 7 days, or 56 pills.

¶ 79     On January 31, Jill went in for an office visit, reporting pain at 5 out of 10. Dr. Lipov prescribed Norco, 2 tablets at 4 times a day, or 240 pills for the month, and Klonopin, 3 times a

day, with a 30-day supply, or 90 Klonopin pills, all in her possession at once and no short term oversight by Dr. Lipov.

¶ 80    Dr. Richeimer testified that he did not see any evidence that Dr. Lipov was attempting to wean or taper Jill off of these opioids. Nor did he see anything in the chart that would indicate that Dr. Lipov talked to Jill about the early refills, or any type of intervention or help.

¶ 81    On February 14, 2011, two weeks later, Jill went back for another office visit. Dr. Lipov prescribed a double sized Dilaudid, the 8-milligram pills, at 2 pills per dose, 3 times a day, or 180 pills or 1440 milligrams of Dilaudid in a 14-day supply.

¶ 82    As of February 14, Jill should have had 120 Norcos left while he was prescribing those 180 Dilaudids.

¶ 83    On February 28, the chart shows a phone call relating that Jill was given 4-milligram Dilaudids, not the 8-milligram pills he prescribed, and she wanted the rest of her medication. She was told to call the next day to talk to Dr. Lipov.

¶ 84    On March 1, 2011, a prescription was written for Dilaudid. There is some confusion in the record about whether the Dilaudid was for 4-milligram tablets with 2 tablets taken 3 times a day, or 8-milligram tablets with 2 tablets taken 3 times a day for 15 days. In addition, Dr. Lipov prescribed Klonopin, 0.5-milligram pills taken 3 times a day, or 90 pills.

¶ 85    On March 15, 2011, Jill called again. The chart indicates that Jill said she had a headache for the last five days while decreasing her Dilaudid dosage, that she would run out that day, and wanted 15 days of Norco to get her through to her next medical management visit on March 28. She said she finished her Dilaudid and wanted Norco. She was given a prescription for Norco, 10-milligram pills with 2 pills taken 4 times a day for 15 days, or 120 tablets.

¶ 86    On April 11, the pharmacy called Dr. Lipov and indicated that Jill wanted a refill on her Flexeril and her Norco.

¶ 87    The prescriptions were refilled and called in to Osco, not Walgreens, for 14 days so that all the prescription medications would "sync and up" to refill on the same date. Dr. Lipov prescribed Norco, "10 mg/325, 2 [pills] 4x a day, for 14 days," or 112 tablets, and a renewal for the Flexeril.

¶ 88    On June 6, 2011, Jill called and said she was out of medicine because she was "shorted some Norco" at her last refill. She thought she was shorted about 25 or 30 pills and left a Walgreen's number for the doctor to call in a prescription. Dr. Lipov did approve a new prescription for Norco, 2 pills 4 times a day, which was called in to the pharmacy for Jill.

¶ 89    Two days later, on June 8, 2011, Jill had an office visit with Dr. Lipov. She was reporting pain 10 out of 10, postoperative. Dr. Lipov prescribed Klonopin, which is the benzodiazepine; Flexeril, the muscle relaxant; and Dilaudid, 8 milligrams, *i.e.*, the double-sized one, with 2 pills taken 4 times a day for 14 days.

¶ 90    On July 7, 2011, Jill's chart shows a phone call from the pharmacy relating that Jill "has an appointment for July 21 and has had an increase in breakthrough pain and is out of her Norco." Dr. Lipov authorized calling in a 14-day prescription for Norco, "10 mg/325" (that is, 10 milligrams of hydrocodone and 325 milligrams of acetaminophen in each pill), with 2 pills taken 4 times a day for 14 days, or 112 pills.

¶ 91    On July 14, 2011, seven days later, Jill again had an office visit with Dr. Lipov and reported her pain level was 6 out of 10. At that visit, she told the doctor that she wanted to start coming off her medications.

¶ 92    In response, Dr. Lipov prescribed Vicoprofen, which again is similar to Norco, with the same core ingredient of hydrocodone, but instead of 10 milligrams, it is 7.5 milligrams or 25% smaller. The prescription was for 2 pills 4 times a day and was limited to a 7-day supply, or 56 pills. However, she should have had some of the Norco left from her July 7 appointment so there was a potential overlap during this period. Dr. Lipov also prescribed Xanax, although there are two prescriptions for Xanax, one is for 7 days and one is for 14 days; the record is not clear about which one Jill had filled at the pharmacy.

¶ 93    Seven days later, on July 21, 2011, Jill had another office visit and reported her pain at 5 out of 10, which is a reduction in pain from the 6 out of 10 from the office visit one week earlier. In response to this reduction in pain, Dr. Lipov prescribed the more serious Norco instead of Vicoprofen, that is, 10-milligram tablets of Norcos, with 2 tablets taken 4 times a day (240 pills), while she still should have had 7 days worth of Vicoprofen and some Xanax on hand.

¶ 94    There is nothing in this record that indicates that Dr. Lipov ever asked Jill to return her unused prescription medications to him, or at least bring them in to be counted and checked; nothing to indicate he ever discussed the possibility of addiction with her or her treatment options. She seems pretty much to have been giving the directions to a doctor who appears only too willing to write the prescriptions.

¶ 95    When you do the math, she just had too many pills without close supervision. No wonder she was "fuzzy." "She was out of control and forgot what she took." Proximate cause: Dr. Lipov failing to recognize her addiction, overprescribing, undermonitoring.

¶ 96    But there is still another reason I dissent. The judge's confusing instructions to the jury resulted in verdicts that were not only inconsistent but totally irreconcilable. If Dr. Lipov was not the sole proximate cause of her death, then it stands to reason someone else was also responsible. Yet the jury found at the same time that Jill was 50% responsible, leaving the other 50% unattributed.

¶ 97    When the judge decided to give the sole proximate cause instruction, over plaintiff's objection, the jury was left with the very clear statement from the judge that Dr. Lipov could only be held accountable if his actions were the only ones that mattered. Then the jury heard evidence that John's delay in seeking emergency attention for Jill compounded the problem. In the face of the jury instruction and the evidence, the jury found for the plaintiff, John Guerra and zero damages and that Jill Guerra was 50% responsible for her death and the sole proximate cause of Jill Guerra's death was conduct of someone other than Dr. Eugene Lipov.

¶ 98    The judge acknowledged that she should not have given the sole proximate cause instruction, but not until after the jury returned with the inconsistent verdicts. This was error because the judge had a duty to recall the jury immediately and give the proper instruction. See *Krklus v. Stanley*, 359 Ill. App. 3d 471, 493-94 (2005).

¶ 99    Jury confusion about its instructions is reason enough to remand for a new trial. Compound that with the conflicting jury verdicts and the fact that Dr. Richeimer, with very little help from the plaintiff's attorneys, demonstrated proximate cause, I cannot agree with my colleagues in this matter.