NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190454-U

NO. 4-19-0454

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 12, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TRICIA A. NAPIER and CHAD A. NAPIER, | ) | Appeal from the |
|     Plaintiffs-Appellees, | ) | Circuit Court of |
|     v. | ) | Macon County |
| DECATUR MEMORIAL HOSPITAL, an Illinois Not- | ) | No. 13L65 |
| for-Profit Corporation, | ) | |
|     Defendant-Appellant. | ) | Honorable |
| | ) | Rodney S. Forbes, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1  *Held:*  (1) The trial court's alleged errors did not cumulatively prejudice defendant.

(2) The trial court did not err in denying defendant's motions for a directed verdict and for judgment *n.o.v.*

(3) The trial court did not abuse its discretion by denying defendant's motion seeking an order of remittitur.

¶ 2  On January 18, 2019, a jury returned a verdict in favor of plaintiffs, Tricia A. Napier and Chad A. Napier, against defendant, Decatur Memorial Hospital (the Hospital), in the amount of $252,875. On June 10, 2019, the trial court denied defendant's posttrial motion. Defendant appeals, arguing as follows: (1) the court committed a series of errors that cumulatively prejudiced the outcome of the trial, (2) the court erred in denying defendant's motions for a directed verdict and judgment *n.o.v.*, and (3) the court erred in denying defendant's posttrial request for an order of remittitur. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On June 5, 2013, plaintiffs filed their complaint against defendant. The complaint contained a count on Tricia's behalf against defendant pursuant to the doctrine of *respondeat superior* based on the actions of defendant's nursing staff while a hysterectomy was performed on Tricia by Dr. Jeffrey S. Pfeiffer.  The complaint alleged the operative nursing staff pulled the wrong type of sutures (nonabsorbable) from defendant's surgical supplies and supplied the wrong type of suture to Dr. Pfeiffer to close Tricia's vaginal cuff.  According to the complaint, the sutures failed to dissolve, and Tricia began suffering intense vaginal pain, dyspareunia, vaginal bleeding, and referred abdominal and right lower quadrant pain because of the non-dissolvable sutures.  The complaint also contained a loss of support and consortium claim by Chad against defendant.  In addition, the complaint contained a count on Chad's behalf against defendant pursuant to the Family Expense Act (750 ILCS 65/15 (West 2012)).  Plaintiffs did not file a claim against Dr. Pfeiffer.

¶ 5            According to a case management order filed on September 9, 2013, plaintiffs were to complete their final opinion witness disclosures by December 2, 2013.  In October 2013, defendant moved to vacate the case management order.  In December 2013, the trial court vacated the original case management order and filed a new case management order, setting April 15, 2014, as plaintiffs' deadline for disclosing its opinion witnesses.  Another amended case management order was filed on November 9, 2015, setting February 1, 2016, as the deadline for plaintiffs to disclose their opinion witnesses.  On February 8, 2016, the trial court granted plaintiffs an extension until March 17, 2016, to disclose their opinion witnesses.  On May 2, 2016, plaintiffs asked for another 45-day extension to disclose their opinion witnesses. On May 3, 2016, the Hospital responded, asking the court to deny plaintiffs' request and bar

plaintiffs from disclosing opinion witnesses.

¶ 6 On May 11, 2016, plaintiffs filed a supplemental disclosure, naming Jeremy Heiser, R.N., as an opinion witness on the standard of care for defendant's nurses. On July 1, 2016, the trial court barred Heiser's testimony because of the late disclosure. On July 13, 2016, the Hospital filed a motion to bar plaintiffs' Illinois Supreme Court Rule 213(f)(1) and (f)(2) (eff. Jan. 1, 2007) witnesses because plaintiffs had not disclosed such witnesses in violation of the February 8, 2016, case management order. On August 3, 2016, the court denied defendant's motion. The court ordered plaintiffs' counsel to submit a new case management order within 10 days.

¶ 7 On August 11, 2016, the trial court approved plaintiffs' case management order, which set September 1, 2016, as the new deadline for plaintiffs to disclose opinion witnesses. On August 18, 2016, plaintiffs filed a document identifying its Rule 213(f)(1) and (f)(2) opinion witnesses. Plaintiffs identified themselves as lay opinion witnesses and the following individuals as independent expert witnesses who would provide testimony consistent with their discovery depositions: Debbie Cole; Donna Gilbert; Sally Hodges, R.N.; Kristina Mahon, R.N.; Heidi Southerland, R.N.; and Regina Woltz, C.S.T. Plaintiffs also identified Jay Kellar, M.D., Jeffery Pfeiffer, M.D., and Roy Tsuda, M.D., and provided a more detailed overview of their expected testimony.

¶ 8 On October 21, 2016, defendant filed a motion to bar plaintiffs' witnesses from offering any testimony that had not been previously disclosed during the witnesses' discovery depositions. Defendant argued its motion was consistent with an order entered by the trial court on August 3, 2016. Defendant also moved to bar any opinions the witnesses were not qualified to offer. Specifically, defendant argued the named physicians could not offer expert testimony on

the standard of care applicable to licensed nurses or surgical technologists. The trial court granted defendant's motion on December 19, 2016.

¶ 9       On February 2, 2018, defendant filed a motion for the trial court to reconsider its August 3, 2016, order denying defendant's motion to bar plaintiffs' Rule 213(f)(1) and (f)(2) witnesses. On April 4, 2018, the trial court denied defendant's motion to reconsider. The court instructed plaintiffs to disclose their witnesses within 14 days. The court also vacated the dates previously set for the final pretrial hearing and the jury trial.

¶ 10      On April 16, 2018, plaintiffs filed a supplemental identification of witnesses. On April 26, 2018, defendant filed a motion to strike and bar plaintiffs' supplemental identification of witnesses.

¶ 11      On June 8, 2018, the trial court held a hearing on defendant's motion to strike and bar plaintiffs' supplemental identification of witnesses. The trial court barred any new witness disclosures plaintiffs had not previously disclosed but denied defendant's motion to bar plaintiffs' Rule 213(f)(2) independent opinion witnesses.

¶ 12      In January 2019, the jury trial commenced. Chad Napier testified Tricia started having pain, mild bleeding, and depression before seeing Dr. Pfeiffer. After consulting with Dr. Pfeiffer, Tricia decided to have a hysterectomy in October 2011. After the surgery, Tricia seemed to be in more pain. She spent a lot of time in the bathroom and frequently cried. Their sex life changed with a decrease in intercourse. Chad testified sex was painful for Tricia. He testified their relationship suffered. Tricia's condition kept her from boating, vacationing, and other activities she did before the hysterectomy. Approximately a year after the hysterectomy, Tricia underwent another surgery. After this procedure, she slowly started to recover, was crying less, and did not have as much pain. He believed Tricia's pelvic pain and pain during intercourse

had ended, but their relationship was not the same as it was before the hysterectomy.

¶ 13　　　　Dr. Jeffrey Pfeiffer testified he is a board-certified obstetrician-gynecologist. In September 2011, Tricia reported to him a long history of pelvic pain. He did an ultrasound but found nothing remarkable. His presumptive diagnosis was endometriosis. On October 19, 2011, he performed a hysterectomy on Tricia at defendant's facility. Although he had performed approximately 1000 hysterectomies, he had only performed between four and six single-site laparoscopic hysterectomies, which was the procedure he used on Tricia.

¶ 14　　　　Dr. Pfeiffer explained the vaginal cuff must be sealed after the uterus is removed during a hysterectomy. It was his opinion, based upon a reasonable degree of medical certainty, dissolvable sutures should always be used to seal the vaginal cuff. During and immediately after the surgery, Dr. Pfeiffer believed he was using an absorbable suture called Vicryl. Vicryl was listed on his surgical preference card. No nonabsorbable sutures were listed on his preference card.

¶ 15　　　　During the single port hysterectomy, Dr. Pfeiffer used an Endo Stitch device to seal the vaginal cuff. During surgery, when he is handed the Endo Stitch, it should already be loaded with the cartridge of sutures. He could watch the Endo Stitch being loaded with the cartridge of sutures. However, he normally did not do so and did not recall watching the loading process during Tricia's surgery. The surgical staff does not tell him whether the Endo Stitch is loaded with absorbable or nonabsorbable sutures when he is given the device. When he used the Endo Stitch during Tricia's hysterectomy, he did not know it was loaded with nonabsorbable sutures. When handling the suture material, he did not notice he was using a nonabsorbable suture. Had he realized the suture material was nonabsorbable, he would have stopped using it. The surgical report he prepared after the surgery noted he used Vicryl, which turned out to be

incorrect.

¶ 16    After the hysterectomy, he and his medical partners continued to see Tricia. She complained of persistent pain in her right lower quadrant, bleeding, and pain during intercourse. Months after the hysterectomy, Dr. Kellar examined Tricia and noticed she still had sutures present in her vaginal cuff. He and Dr. Kellar tried to remove the sutures that day but it was too painful for Tricia. The next day, they sedated Tricia and removed some of the sutures during an in-office procedure. He believed at the time the removal was satisfactory or complete.

¶ 17    However, on September 19, 2012, Tricia still had pelvic pain, pain with intercourse, and bleeding. Dr. Pfeiffer testified a suture was protruding through the vaginal cuff in two places. Dr. Pfeiffer stated it was his opinion to a reasonable degree of medical certainty the nonabsorbable sutures were contributing to her pelvic pain, pain with intercourse, and bleeding. Later, in October 2012, Dr. Kellar performed a surgery on Tricia to remove the remaining nonabsorbable sutures. Two separate sutures were removed from Tricia's vaginal cuff. Dr. Pfeiffer testified the primary purpose of the procedure was to remove the sutures.

¶ 18    On cross-examination, he admitted it was his decision to use the Endo Stitch device. However, he said the nursing staff or surgical technologist essentially directed him to use the nonabsorbable sutures because they loaded the Endo Stitch device with nonabsorbable sutures. He acknowledged he would not use an item or device he did not want even if a nurse handed it to him. He also stated his preference card did not mention what type of suture and needles to use with the Endo Stitch device. When asked if his preference card stated what suture material to have available with the Endo Stitch device, Dr. Pfeiffer said, "O Vicryl." However, he admitted the specific types of Vicryl he listed on his preference card were not compatible with the Endo Stitch device. Dr. Pfeiffer testified he did not have a specific recollection of what type

of suture he asked for during Tricia's surgery. However, he noted he would not normally say "give me a O Vicryl on an Endo Stitch."

¶ 19 On redirect, Dr. Pfeiffer testified Tricia got better after the sutures were removed in October 2012. He testified a cartridge containing absorbable sutures for use with the Endo Stitch device exists. This was the type of cartridge he thought was in the Endo Stitch during Tricia's hysterectomy. On re-cross examination, Dr. Pfeiffer answered no when asked, "[W]ith respect to any cartridge applicable to the Endo Stitch device which may have absorbable suture material on it, do you know what the trade name is of that cartridge, what that cartridge is called?" He also stated he would assume the cartridges for the Endo Stitch are manufacturer-specific, *i.e.*, the Endo Stitch would use specific cartridges made by the manufacturer of the Endo Stitch. He then stated Vicryl and the Endo Stitch are made by different manufacturers.

¶ 20 The parties agreed defendant would call the nurses and other surgical staff during plaintiffs' case-in-chief to avoid these witnesses being called twice. After defendant conducted its direct examination of these witnesses, plaintiffs conducted their cross-examination.

¶ 21 Sally Hodges testified she was the director of surgical services for defendant between 2011 and 2013 and is a registered nurse. As a registered nurse, she worked more as a circulating nurse and seldom worked in the role of a "surgical technologist" or scrub nurse. She was not involved with Tricia's hysterectomy but had been involved in other hysterectomies and had reviewed certain documents and materials in this case, including depositions of the nursing staff at the Hospital, medical records, Dr. Pfeiffer's preference list, and the pick card. She had no experience with the Endo Stitch device. Based on her review of the materials provided to her in this case and her knowledge and experience as a nurse, it was her opinion each of the circulating nurses and surgical technologists complied with the appropriate standard of care

during Tricia's hysterectomy.

¶ 22 Hodges testified the doctor or surgeon is responsible for determining what devices or materials are utilized during a surgery, not the circulating nurse or surgical technologist. She also testified the nurses and surgical technologists are not required to know what devices or materials are most appropriate for use at any given time during a procedure. According to her testimony, the circulating nurse and surgical technologist are not expected to challenge or question the doctor's choice of devices or materials during a surgery. During the read back process during a surgery after the physician has requested sutures, the circulating nurse is not going to identify suture material as absorbable or nonabsorbable. The other nurses who testified generally agreed with Hodges on these points.

¶ 23 Once the circulating nurse performs the read back process, no further confirmation or clarification is necessary unless the doctor has a question. If during the read back process an item is presented to the surgeon and the surgeon uses that material, it is reasonable for the circulating nurse and surgical technologist to believe the item was what the doctor wanted. Again, the other nurses who testified generally agreed with Hodges's testimony on these points.

¶ 24 Based on her experience, it was her general understanding absorbable sutures are used to close the vaginal cuff during a hysterectomy. However, a registered nurse or scrub nurse is not expected to question or challenge the physician's choice of devices or materials. Questioning or challenging a doctor is not within the nurse's scope of practice. Again, this was the general consensus among the nurses who testified.

¶ 25 On cross-examination by plaintiffs' counsel, Hodges stated the same standard of care applied to nurses and surgical technologists assisting with a surgery. She acknowledged she

testified at her deposition she would have retrieved absorbable sutures if she was asked to pick among a variety of different types of sutures for the Endo Stitch. She also acknowledged she testified in her deposition that she would tell the doctor if the only sutures available were nonabsorbable. Based on her experience, absorbable sutures were always used to close the vaginal cuff during a hysterectomy.

¶ 26 Heidi Southerland testified she worked at the Hospital between 2011 and 2013 as an operating room circulating nurse. She was involved in Tricia's hysterectomy on October 19, 2011, as a circulating nurse. She believed she complied with the standard of care. Southerland noted Dr. Pfeiffer's preference card did not make any reference to the suture material to be used with the Endo Stitch. Based on her understanding, the nonabsorbable suture material was the only material available for the Endo Stitch in October 2011 at the Hospital.

¶ 27 On cross-examination, Southerland agreed Dr. Pfeiffer always used dissolvable sutures to close the vaginal cuff during a hysterectomy. Southerland agreed the standard of care for someone in the operating room requires the staff person to give the physician what he asks for. If they do not give the individual what he asks for, this constitutes a breach of the standard of care. Southerland admitted it was her recollection she recognized a non-dissolvable suture was in the Endo Stitch, which she thought was odd because she knew Dr. Pfeiffer always used dissolvable sutures. However, she testified she did not think her standard of care required her to say anything because she does not question the surgeon. She did testify she believed her standard of care required her to advise the physician if she was getting ready to hand him something that, in her experience, he does not use. However, in this case, she testified she gave Dr. Pfeiffer what he asked for. On re-direct, Southerland stated the read back process satisfies the standard of care for telling a physician he is using something he does not normally use.

¶ 28        Regina Woltz, a certified surgical technologist in October 2011, testified she was involved in Tricia's hysterectomy. For Tricia's surgery, Dr. Pfeiffer's preference card did not include any reference to the suture material to have available at the surgery for use with the Endo Stitch. The Vicryl suture material Dr. Pfeiffer listed on his preference card was not compatible with the Endo Stitch. It was her understanding Surgidac, a nonabsorbable suture, was the only suture type available for use at the Hospital when Tricia had her hysterectomy. She testified a surgical technologist does not determine what devices or materials a physician uses during a surgery. Further, a surgical technologist will not challenge or question the physician's choice of an item, material, or device. She did not have an independent recollection of Tricia's hysterectomy.

¶ 29        On cross-examination, she testified she knew Dr. Pfeiffer always used dissolvable sutures to close the vaginal cuff during a hysterectomy. She testified Dr. Pfeiffer did so few single-site hysterectomies she could not testify he always used absorbable sutures to close the vaginal cuff in those procedures. According to Woltz, when the Endo Stitch was brought to her by another nurse in the operating room, Woltz would have read back she had the Endo Stitch and also stated the name of the suture material loaded in the device. She would not have said whether the suture material was nonabsorbable or absorbable.

¶ 30        Kristina Backes testified she was the relief circulating nurse in Tricia's hysterectomy but had no independent recollection of the surgery. She testified she believed she complied with the standard of care for a circulating nurse during Tricia's hysterectomy. She testified she is not familiar with the Endo Stitch or the sutures used with the Endo Stitch. However, according to her testimony, the circulating nurse is not required to know which devices or materials are appropriate for use at any given time during a procedure or to challenge or

question a surgeon's choice of devices or materials during a procedure. During the read back process, if an item is presented at the sterile field by the circulating nurse, the surgeon confirms it, and the material is opened and used by the surgeon, it is reasonable for the nurse to assume the item was what the surgeon wanted. Although she knew Dr. Pfeiffer's preference was to use absorbable sutures to close the vaginal cuff, it was her responsibility to give the surgeon what he asked for.

¶ 31     On cross-examination, she testified she did not know Surgidac was a permanent suture. According to her testimony, the standard of care does not require the nurse to communicate to the doctor that he is being given non-dissolvable sutures. If a nurse loads a device with permanent sutures, the nurse does not need to tell the doctor the device is loaded with non-dissolvable sutures. She did not know why Dr. Pfeiffer was given non-dissolvable sutures.

¶ 32     Donna Gebhart, a surgery informatics specialist, worked for defendant when Tricia's hysterectomy was performed but was not involved in the surgery and had no knowledge regarding the Endo Stitch. She testified a circulating nurse or surgical technologist is not expected to challenge or question a surgeon's choice of devices or materials. However, on cross-examination by plaintiffs' counsel, she testified if a nurse in the operating room knew permanent sutures were never used in a hysterectomy to close the vaginal cuff, the standard of care would have required the nurse to avoid using permanent sutures to protect the patient. The witness stated she thought the nurses would inform a doctor he was using permanent sutures. According to her testimony, the standard of care required a nurse to tell the doctor what was available to use.

¶ 33     Chad Napier was called again and testified he noticed an unpleasant odor coming

from Tricia during sexual intercourse after the hysterectomy. This continued until the sutures were removed after the third surgery in October 2012. The smell prevented them from having intercourse because the smell made them uncomfortable. When defense counsel asked Chad on cross-examination if he knew what caused the smell, Chad testified he thought an infection.

¶ 34    Tricia Napier testified she is married to Chad Napier. Prior to October 19, 2011, she was diagnosed with endometriosis. In 2011, she became a patient of Dr. Pfeiffer. After consulting with Dr. Pfeiffer, she decided to undergo a hysterectomy. Dr. Pfeiffer performed a single port hysterectomy on her on October 19, 2011. Six weeks after the surgery, she had pain in her right flank, difficulty with urination and bowel movements, and intermittent pain in her vagina. After two or three months, the pain became more acute. After four months, the pain was present on a daily basis and became excruciating. In May 2012, during an exam at Dr. Pfeiffer's office, sutures were found in her vaginal cuff. Dr. Pfeiffer removed some of the sutures in an in-office procedure. She thought Dr. Pfeifer removed four of the sutures. The pain improved after the sutures were removed, but she still had visible blood in her urine. However, by July 2012, the pain had increased dramatically, and she felt like she was being stabbed in her vagina with a knife.

¶ 35    Tricia testified her and Chad's attempts at intercourse were still uncomfortable. She would feel the stabbing pain during intercourse. She got to the point she did not want to have intercourse. Eventually, at another visit to Dr. Pfeiffer's office, she was told more sutures were visible. Her doctors told her the vaginal cuff might need to be redone, her right ovary might need to be removed, and she possibly had damage to her bladder and bowel. She testified she was told the stitches had hardened—because her body had rejected them—and were rubbing on her cervix or vaginal wall causing the pain. After the final surgery in October 2012, the

stabbing pain in her vagina was alleviated. She did have pain for around five weeks in her lower abdomen from the surgery.

¶ 36    Tricia testified she was physically better but not emotionally. The pain had taken a toll on her, and her relationship with Chad was forever changed. At the time of trial, her relationship with her husband was still not as it was before the hysterectomy.

¶ 37    During the year between her hysterectomy and her final surgery, she was unable to engage in physical activities she enjoyed like riding four wheelers, boating, and wakeboarding. After working all day, she just wanted to come home and go to bed. She did not even want to do things around the house.

¶ 38    Defendant played the jury Dr. Katherine Cabai's video evidence deposition. Dr. Cabai testified she taught surgical technology, surgical assisting, and anesthesia technology at the College of DuPage and had worked in the operating room as a surgical assistant for more than 35 years. Dr. Cabai stated she is a certified surgical technologist, a registered nurse, a certified nurse of the operating room, an R.N. first assistant, a certified surgical first assistant, and a certified anesthesia technologist, and had experience in the operating room during hysterectomies.

¶ 39    Cabai was familiar with the standard of care applicable for nursing staff and certified technologists in the operating room with respect to their communications and clinical actions. Based on her review of the evidence in this case, she testified the nursing staff and surgical technology staff at the hospital complied with the standard of care during the hysterectomy.

¶ 40    According to Dr. Cabai's testimony, the standard of care applicable to a circulating nurse or a surgical technologist does not require them to determine what devices or

materials are utilized at any point during a surgery. Further, it is not required by the standard of care for a circulating nurse or surgical technologist to know which device or material is most appropriate at any given time during a surgery. The choice of devices and materials in a surgery is not up to the surgical technologist or circulating nurse. When a physician chooses a particular device or material during a surgery, the standard of care for a surgical technologist or circulating nurse does not require the nurse to challenge the physician's selection.

¶ 41　　　　Dr. Cabai also testified the standard of care for circulating nurses and surgical technologists performing a read back after a device or material has been requested by a physician was not breached in this case. Circulating nurses and surgical technologists are not required to read the entire label on devices and materials during the read back process. Further, the standard of care does not require a circulating nurse or surgical technologist to identify whether sutures are absorbable or nonabsorbable during the read back process. Once a read back is performed by either the circulating nurse or surgical technologist, the standard of care does not require any further confirmation or clarification. If a physician does not respond to the read back and uses the item, device, or material presented to the physician, it is reasonable for the circulating nurse or surgical technologist to rely on the physician's decision to use the item, device, or material.

¶ 42　　　　Dr. Cabai testified she did not review anything in this case identifying or suggesting Dr. Pfeiffer asked for something other than the Surgidac nonabsorbable sutures. With regard to the Endo Stitch, neither the preference list or case card identified the particular suture material Dr. Pfeiffer wanted to utilize with the Endo Stitch. Dr. Cabai believed the Endo Stitch would have been loaded with the suture material in the operating room. According to her testimony, if a nurse knew a nonabsorbable suture was about to be utilized by the doctor in a procedure where the doctor always used absorbable sutures, the nurse would have no duty to

speak up and warn the physician because if the nonabsorbable suture was in the operating room the nurse could assume the doctor wanted to try something different. Finally, she testified the standard of care did not require the nurses to know Surgidac is a nonabsorbable suture.

¶ 43    Dr. Magdy Milad, a board-certified physician in obstetrics, gynecology, reproductive endocrinology, and infertility, testified he is the division director for minimally invasive gynecologic surgery at Northwestern Memorial Hospital and also a full professor at Northwestern University. He had performed 15 to 20 single-site hysterectomies. Based on his knowledge, training, and experience, it is the surgeon who has the obligation during a procedure to determine the devices or materials to utilize and how to utilize them. He stated the surgeon is the "pilot in command," has final control, and must have an intimate familiarity with the devices and materials he uses during a surgery. He stated he would not expect a registered nurse or surgical technologist to advise him on what devices or materials to use or to challenge his choice of devices and materials, including sutures.

¶ 44    According to Dr. Milad, it is the surgeon who is responsible for the materials used on a patient. In this case, the Endo Stitch and the sutures used were in the surgeon's control. Whether a suture is absorbable or nonabsorbable is not stated as part of the read back process. Dr. Pfeiffer did not list the type of suture he wanted to use with the Endo Stitch on his preference card, and Vicryl is not available for the Endo Stitch.

¶ 45    Dr. Milad testified Dr. Pfeiffer had multiple opportunities to recognize the suture material was nonabsorbable based on the sutures color. Even though the Surgidac, nonabsorbable suture material, was the only thing available to use with the Endo Stitch, Dr. Pfeiffer could have closed the vaginal cuff—through the vagina and not the single port—using the absorbable suture material on hand. Dr. Milad testified closing the vaginal cuff vaginally is a

very common procedure. The doctor also testified it was his opinion the presence of the nonabsorbable suture material in the vaginal cuff did not cause Tricia's injuries.

¶ 46 On cross-examination, Dr. Milad stated Dr. Pfeiffer did not ask for a nonabsorbable suture but that is what he received. Dr. Milad also noted he had never used a nonabsorbable suture for a hysterectomy. However, he stated he did not think using a nonabsorbable suture was below the standard of care. Dr. Milad testified he saw no indication anyone communicated to Dr. Pfeiffer that he was using a nonabsorbable suture.

¶ 47 The jury returned a verdict for plaintiffs awarding $252,875 in damages. On June 10, 2019, the trial court denied defendant's posttrial motion. This appeal followed.

¶ 48                                   II. ANALYSIS

¶ 49 In medical negligence cases, a plaintiff bears the burden of establishing by a preponderance of the evidence (1) the standard of care, (2) a breach of the standard of care, and (3) the breach proximately caused the plaintiff's injury. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872 (1986). Unless a medical professional's negligence is so clearly apparent or the treatment so common as to be within the general knowledge of a layperson, expert medical testimony is required to establish the standard of care and the medical professional's deviation from that standard. *Purtill*, 111 Ill. 2d at 242, 489 N.E.2d at 872.

¶ 50                              A. Cumulative Prejudice

¶ 51 Defendant first argues the trial court made a series of errors resulting in cumulative prejudice against defendant and argues a new trial is warranted. We find most of the individual arguments defendant raised in the context of cumulative prejudice are forfeited for a variety of reasons. We note Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) provides an appellant's brief shall contain:

- 16 -

"Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal where evidence may be found. Citation of numerous authorities in support of the same point is not favored. Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

This court is not a depository into which an appellant can dump the burden of argument and research. *Elder v. Bryant*, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515, 522 (2001). Further, this court is not obligated to search the record to overturn a trial court's judgment. Regardless of forfeiture, defendant was not prejudiced by the alleged errors it raised in this case.

¶ 52                    1. *Plaintiffs' Witness Disclosure*

¶ 53          Defendant argues the trial court erred by denying defendant's motion to bar plaintiffs' Rule 213(f)(2) witnesses. Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). Their argument contains no citations to the record to assist this court in reviewing this issue. As a result, this argument is forfeited pursuant to Rule 341(h)(7) (Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)). Further, it appears from the record the trial court extended the deadline for disclosing witnesses, and plaintiffs disclosed their witnesses long before the trial. Defendant makes no argument why the trial court could not extend the deadline for plaintiffs to disclose their witnesses, and we find this is another reason defendant forfeited this issue. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 54                    2. *Dr. Pfeiffer's Testimony*

¶ 55          Defendant next argues the trial court erred in admitting Dr. Pfeiffer's testimony that the presence of the sutures caused Tricia's injuries because his testimony was speculative

- 17 -

and contradicted his deposition testimony. Defendant also argues the court erred by allowing Dr. Pfeiffer to testify to an opinion not included in his discovery deposition. Defendant points out the trial court ruled Dr. Pfeiffer could not offer opinions not disclosed in his discovery deposition. Defendant took issue with Dr. Pfeiffer's testimony the primary purpose of the October 2012 surgery was to remove the nonabsorbable sutures.

¶ 56     Once again, defendant forfeited both of these issues pursuant to Rule 341(h)(7) by failing to include citations to the record in the argument section of its brief. Regardless of forfeiture, the trial court did not abuse its discretion in allowing the testimony of which defendant complains. "The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's rulings will not be disturbed absent an abuse of that discretion." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109, 806 N.E.2d 645, 651 (2004).

¶ 57     Before Dr. Pfeiffer testified at trial, the trial court had reviewed Dr. Pfeiffer's deposition testimony. According to the court, Dr. Pfeiffer did state during his deposition that he could not say for certain whether the nonabsorbable sutures might have injured Tricia. However, the court noted Dr. Pfeiffer also testified it was his opinion to a reasonable degree of medical certainty that the sutures were possibly causing Tricia's pelvic pain. Although not specifically noted by the trial court, Dr. Pfeiffer did more than simply say it was his opinion the sutures were possibly causing Tricia's pelvic pain. In his deposition, Dr. Pfeiffer testified Tricia returned to his office on September 19, 2012, complaining of pelvic pain, pain with intercourse, and bleeding. Upon exam, more sutures were found protruding through her vaginal cuff in two places. Dr. Pfeiffer opined Tricia's bleeding, pelvic pain, and pain during intercourse were caused, at least in part, by the nonabsorbable sutures.

¶ 58     As for Dr. Pfeiffer's testimony the primary purpose of the October 2012 surgery

was to remove the nonabsorbable sutures, the trial court did not abuse its discretion in allowing this evidence. According to Dr. Pfeiffer's deposition, when the sutures were found in September 2012, Dr. Keller decided to laparoscopically remove the remaining sutures. Defendant ignores this testimony.

¶ 59                                    3. *Testimony Regarding Vaginal Odor*

¶ 60          Defendant next argues the trial court erred by allowing Chad Napier to testify his wife's unpleasant vaginal odor after the hysterectomy was related to the nonabsorbable sutures left in her vaginal cuff, which caused an infection. Again, because defendant did not include citations to the record in his brief, we find this argument forfeited pursuant to Rule 341(h)(7). Regardless of forfeiture, the trial court did not abuse its discretion in allowing Chad to testify about the unpleasant odor as it was relevant to his consortium claim. As for Chad's testimony the sutures caused an infection, this only came out during defendant's cross-examination of Chad when defense counsel asked, "Do you know where that smell came from, what caused it?" Defendant cannot complain Chad was not qualified to offer an opinion as to the cause of the odor when defendant asked for his opinion.

¶ 61                                    4. *Reptile Theory*

¶ 62          Defendant next takes issue with plaintiffs' counsel asking Nurse Gebhart whether the standard of care for nurses included a duty to do no harm and/or protect the patient. According to defendant, this misrepresented the standard of care. Although defendant cites to the record, defendant cites no authority in support of its argument other than referring to a multi-paged motion *in limine* defendant filed in the trial court and provides only conclusive reasoning. As a result, defendant forfeited this issue pursuant to Rule 341(h)(7). An appellant must provide its reasoning in its brief.

- 19 -

¶ 63                                    5. *Medical Bill for 2012 Surgery*

¶ 64          Defendant next argues the trial court erred in admitting plaintiffs' medical bills related to the October 2012 surgery because plaintiffs did not separate the charges for removing the nonabsorbable sutures and the charges for the oophorectomy procedure performed at the same time. Defendant relies on *Gill v. Foster*, 157 Ill. 2d 304, 626 N.E.2d 190 (1993). Defendant notes Dr. Milad testified at trial the oophorectomy was unrelated to the presence of the sutures in Tricia's vaginal cuff.

¶ 65          The situation in this case is distinguishable from *Gill*. In *Gill*, the trial court did not allow certain medical bills to be admitted. The supreme court noted, "The admission of evidence is within the sound discretion of the trial court and a reviewing court will not reverse the trial court unless that discretion was clearly abused." *Gill*, 157 Ill. 2d at 312-13, 626 N.E.2d at 194. The supreme court found the trial court did not abuse its discretion in not allowing the plaintiff to introduce a bill for 23 days of the plaintiff's hospitalization amounting to $19,625.98 and a bill from a surgeon in the amount of $2550. The focus of the supreme court was the medical bill for the 23 days in the hospital. *Gill*, 157 Ill. 2d at 311-13, 626 N.E.2d at 193-94. According to the court's decision:

>          "The trial judge apparently excluded the two bills because the plaintiff made no effort to separate which charges on the bills would necessarily have been incurred as the natural result of a necessary repair surgery for a herniated stomach, and which, if any, were incurred as the result of something chargeable to defendant's *** negligence." *Gill*, 157 Ill. 2d at 311, 626 N.E.2d at 193-94.

The supreme court found the voluminous medical bills did not establish a reasonable basis for determining damages based on the facts in that case. *Gill*, 157 Ill. 2d at 313, 626 N.E.2d at 194.

The court noted, "[A] reasonable [trial] court could have found that such an impressive bill could have confused or misled the jury as to the extent of damages caused by [the defendant's] negligence." *Gill*, 157 Ill. 2d at 313, 626 N.E.2d at 194.

¶ 66    The situation in this case is different. Defendant is arguing the trial court erred in admitting the bill for one surgery. Granted, during the surgery, the surgeon performed an oophorectomy in addition to removing the nonabsorbable sutures. However, plaintiff introduced evidence the primary purpose for the surgery was to remove the sutures, not to perform the oophorectomy. Defendant does not argue the oophorectomy would have occurred absent the need to remove the sutures. Based on the facts in this case, we do not find the trial court clearly abused its discretion by admitting this evidence.

¶ 67                            6. *Jury Instructions*

¶ 68    Defendant next argues the trial court erred in giving jury instructions on (1) circumstantial evidence; (2) future emotional distress, future loss of normal life, and future loss of consortium; and (3) aggravation of a pre-existing condition. Defendant contends no evidence supported giving these instructions. "The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002). Once again, defendant fails to cite to the record in the argument section of its brief on these issues. As a result, we find these issues forfeited pursuant to Rule 341(h)(7).

¶ 69    Regardless of forfeiture, our supreme court has held a litigant has the right to have the jury instructed upon a theory of his case if the theory is supported by the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100, 658 N.E.2d 450, 458 (1995). The evidence

supporting a theory may be slight. *Leonardi*, 168 Ill. 2d at 100, 658 N.E.2d at 458. "The question of what issues have been raised by the evidence is within the discretion of the trial court." *Leonardi*, 168 Ill. 2d at 100, 658 N.E.2d at 458.

¶ 70 Based on the evidence in this case, the trial court did not err in giving a jury instruction regarding circumstantial evidence, future loss of normal life, and preexisting conditions. It is difficult to understand how defendant can argue this case did not involve circumstantial evidence. Contrary to defendant's arguments, it seems clear to this court both plaintiffs and defendant were relying on circumstantial evidence. As to future loss of normal life, Tricia testified she was still healing emotionally as a result of her injuries and her relationship with Chad was "forever changed." Tricia also noted the pain she experienced over the year after her hysterectomy had really taken a toll on her. Chad testified their relationship was not back to where it was before the hysterectomy. Granted, this was not much evidence. However, as previously noted, the evidence may be slight and an instruction still given. *Leonardi*, 168 Ill. 2d at 100, 658 N.E.2d at 458. Finally, the evidence showed Tricia had been diagnosed with endometriosis and had some of the same symptoms prior to the hysterectomy as she did after the hysterectomy. The trial court did not abuse its discretion in instructing the jury not to limit plaintiffs' damages because of a preexisting condition.

¶ 71 As for the instructions on future emotional distress and future loss of consortium, even if defendant could establish the trial court abused its discretion in giving these instructions, the jury did not award plaintiffs damages for future emotional distress or future loss of consortium. As a result, this court fails to see how defendant was prejudiced by these two instructions.

¶ 72 B. Directed Verdict or Judgment *N.O.V.*

- 22 -

¶ 73    Although motions for a directed verdict and judgment *n.o.v.* are raised at different points during a trial, they raise the same questions and are governed by the same rules of law. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37, 983 N.E.2d 414.  Either motion should only be granted when all of the evidence, viewed in the aspect most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict based on the evidence could ever stand.  *Lawlor*, 2012 IL 112530, ¶ 37. Defendant argues the trial court erred by not granting his motion for directed verdict or his motion for judgment *n.o.v.* because the evidence, when viewed in a light most favorable to the plaintiffs, failed to prove (1) a breach of the standard of care and (2) the breach proximately caused Tricia's injury.  We disagree.

¶ 74                    1. *Breach of Standard of Care*

¶ 75    Defendant argues the nurses and surgical staff members who defendant called during plaintiffs' case-in-chief testified the nurses and surgical staff all complied with the applicable standard of care during Tricia's surgery, including in their communications with Dr. Pfeiffer.  In its brief, defendant acknowledges the standard of care required the nursing staff to obtain what the doctor asked for during the surgery and did not require them to challenge a physician's choice of items and materials to use during the surgery.  Further, under the applicable standard of care, the staff did not need to read the entirety of a label or identify sutures as absorbable or nonabsorbable during the read-back process after the item or material is requested by the physician.

¶ 76    The jury heard testimony it is the surgeon's responsibility, not the responsibility of the circulating nurse or surgical technologist, to determine what devices and material to use during a surgical procedure.  Once the nurse or surgical technologist performs the read back

- 23 -

process, no further confirmation or clarification is necessary unless the doctor has a question. According to defendant, "the sum of the [surgical staff's] testimony was that the nonabsorbable suture material was presented to Dr. Pfeiffer," the read back procedure was followed, Dr. Pfeiffer confirmed the Surgidac material was what he wanted, the Surgidac material was opened, and Dr. Pfeiffer used it to seal Tricia's vaginal cuff.

¶ 77      Defendant does not mention the sum of the testimony of the surgical staff was that they knew Dr. Pfeiffer only used absorbable sutures during hysterectomies. Further, Dr. Pfeiffer testified he did not request the Surgidac nonabsorbable sutures and was not told during the read back process that nonabsorbable sutures were loaded into the Endo Stitch.

¶ 78      When viewing this evidence in a light most favorable to plaintiffs, Dr. Pfeiffer did not tell the nurses to load Surgidac nonabsorbable sutures into the Endo Stitch. From the record, it does not appear Dr. Pfeiffer even knew the brand names of the sutures used in the Endo Stitch. His preference list did not include the type of suture to use with the Endo Stitch. Instead of Dr. Pfeiffer, it was a member of the surgical staff who chose what type of suture cartridge to load in the Endo Stitch. Even though the surgical staff knew Dr. Pfeiffer (1) used absorbable sutures during hysterectomies, (2) did not tell the nurses what type of sutures to load in the Endo Stitch, and (3) did not include what type of sutures to use with the Endo Stitch on his preference list, someone on the surgical staff decided to go beyond Dr. Pfeiffer's order and choose, incorrectly in this case, what type of sutures to load in the Endo Stitch and failed to inform Dr. Pfeiffer what type of sutures were loaded.

¶ 79      Heidi Southerland testified a nurse breaches the standard of care if a nurse does not give a doctor what he asks for. Further, Donna Gebhart testified a nurse present for a surgery where the nurse knew only absorbable sutures were used would breach the standard of care by

giving the surgeon nonabsorbable sutures. Finally, Dr. Milad testified Dr. Pfeiffer did not ask for a nonabsorbable suture but he received a nonabsorbable suture in the Endo Stitch. If the standard of care requires a nurse to give a doctor what the doctor requests, a nurse breaches the standard of care when the nurse chooses on her own to provide the doctor with an item he did not request and fails to notify the doctor he or she is being given an item or material not requested.

¶ 80         Viewing this evidence in a light most favorable to plaintiffs, someone on defendant's surgical staff breached the standard of care for nurses and/or surgical technologists by (1) choosing on her own to load nonabsorbable sutures into the Endo Stitch and then (2) failing to tell Dr. Pfeiffer what brand (Surgidac), if not type (nonabsorbable vs. absorbable), of suture she loaded into the device. This is not a situation where, viewing the evidence in a light most favorable to plaintiffs, Dr. Pfeiffer mistakenly told the nurses he wanted the Endo Stitch loaded with a type of nonabsorbable sutures and the operative staff simply followed his orders.

¶ 81                    2. *Proximate Cause of Injury*

¶ 82         Defendant next argues plaintiffs failed to prove the breach of the standard of care was the proximate cause of Tricia's injuries. Proximate cause must be established through expert testimony to a reasonable degree of medical certainty that the defendant's negligence was a proximate cause of the plaintiff's injuries. *Johnson v. Loyola*, 384 Ill. App. 3d 115, 121, 893 N.E.2d 267, 272 (2008). The causal connection must be more than speculative or merely possible. *Johnson*, 384 Ill. App. 3d at 121, 893 N.E.2d at 272. Proximate cause is generally a question for the jury. *Johnson*, 384 Ill. App. 3d at 121, 893 N.E.2d at 272.

¶ 83         Proximate cause has two elements—cause in fact and legal cause. *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 828, 893 N.E.2d 949, 970 (2008). To establish cause in fact, a plaintiff must present evidence proving "within a reasonable degree of

medical certainty, that defendants' breach of the standard of care was more probably than not a proximate cause of the resulting injury." *LaSalle Bank*, 384 Ill. App. 3d at 828, 893 N.E.2d at 970. To establish the legal cause, a plaintiff must present evidence establishing "an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." (Internal quotation marks omitted.) *LaSalle Bank*, 384 Ill. App. 3d at 828, 893 N.E.2d at 970. "It is well settled that where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, liability turns upon whether the intervening act or omission was a foreseeable consequence of the situation created by the defendant's negligence." *Robinson v. Boffa*, 402 Ill. App. 3d 401, 405, 930 N.E.2d 1087, 1092 (2010).

¶ 84        Defendant argues plaintiffs did not establish the nonabsorbable sutures were the cause in fact of Tricia's injuries. We disagree. At trial, Dr. Pfeiffer testified it was his opinion, based on a reasonable degree of medical certainty, Tricia's continued pelvic pain and pain with intercourse after the hysterectomy was caused in part by the continued presence of the permanent sutures. Dr. Pfeiffer also testified it was his opinion, based upon a reasonable degree of medical certainty, Tricia's pelvic pain and pain during intercourse as of September 19, 2012, was attributable, in part, to the sutures still in the vaginal cuff. When Dr. Pfeiffer's trial testimony is viewed in a light most favorable to the plaintiffs, plaintiffs presented sufficient evidence the presence of the nonabsorbable sutures in Tricia's vaginal cuff were a cause in fact of Tricia's injuries. Further, it was reasonably foreseeable to the nurse or surgical technologist who loaded the nonabsorbable sutures into the Endo Stitch that Dr. Pfeiffer would use the sutures to seal Tricia's vaginal cuff.

¶ 85        As for the legal cause of Tricia's injuries, defendant argues plaintiffs did not present sufficient evidence to establish the surgical staff was a legal cause of Tricia's injuries.

According to defendant's brief:

> "It was not reasonably foreseeable that by presenting Dr. Pfeiffer
> nonabsorbable suture material, it would cause injury to Tricia Napier. The nurses
> and surgical technologist staff do not have the same training, knowledge, and
> experience as Dr. Pfeiffer. They are not required to know what devices or
> materials are most appropriate for use during a procedure at any given time,
> especially sutures. They are not required to know whether sutures are absorbable
> or nonabsorbable material. Nor are they required to challenge a physician's
> choice of devices or materials for use during a procedure."

However, Dr. Pfeiffer testified he did not tell the nurses he wanted to use the nonabsorbable
suture material in the Endo Stitch device. Further, Dr. Pfeiffer testified no one told him what
type of suture material was loaded in the Endo Stitch device. Evidence was presented someone
on the surgical staff during the surgical procedure loaded the nonabsorbable Surgidac suture
cartridge into the Endo Stitch device without being directed by Dr. Pfeiffer. As previously
stated, it should have been reasonably foreseeable for a nurse or surgical technologist to know
Dr. Pfeiffer would use the nonabsorbable sutures to close Tricia's vaginal cuff because Dr.
Pfeiffer did not know the Endo Stitch was loaded with nonabsorbable sutures.

¶ 86                                    C. Remittitur

¶ 87        Defendant's final argument is the trial court erred in denying defendant's request
for an order of remittitur which defendant raised in its posttrial motion. According to
defendant's brief:

> "A remittitur is warranted in this case for the award of damages for future
> loss of normal life. The jury awarded Tricia Napier $12,500.00 for future loss of

normal life; however, there was no evidence to support instructing the jury on this issue, or to support a jury's award for this element of damages." The only case defendant cites to support its argument the trial court erred in not ordering a remittitur is *Haid v. Tingle*, 219 Ill. App. 3d 406, 579 N.E.2d 913 (1991).

¶ 88 "The standard of review for the circuit court's ruling on a motion for a remittitur is whether the circuit court abused its discretion." *Blackburn v. Illinois Central R.R. Co.*, 379 Ill. App. 3d 426, 430, 882 N.E.2d 189, 193-94 (2008). Defendant argues "[t]here was no evidence of Tricia Napier's inability to pursue the pleasurable aspects of life into the future as an alleged result of the sutures in her vaginal cuff." We disagree. As noted earlier when discussing the jury instruction on this same issue, we noted plaintiffs presented evidence regarding the effects Tricia's injury continued to have on her at the time of the trial. Tricia testified she was still healing emotionally and the pain had really taken a toll on her. She also testified her relationship with Chad was "forever changed."

¶ 89 "The assessment of damages is primarily a function of the jury [citations], and the trial court ordinarily will not substitute its judgment for that of the jury." *Haid*, 219 Ill. App. 3d at 410, 579 N.E.2d at 916. Based on the record in this case, the trial court did not abuse its discretion in denying defendant's request for a remittitur.

¶ 90                                      III. CONCLUSION

¶ 91         For the reasons stated, we affirm the trial court's judgment in this case.

¶ 92         Affirmed.